In re HARBOUR HOUSE OPERATING CORP., Harbour House Realty Corp., and Deja Vu, Inc., Debtors.

Bankruptcy No. 82–672–HL.

United States Bankruptcy Court, D. Massachusetts.

Dec. 21, 1982.

---

8. $976.00 (monthly maximum) $11,712.00 (annual maximum)
 x 12 (months in a year) – 52 (weeks in a year)
 $11,712.00 $ 225.23 (weekly maximum)

9. *See* Exh. D–3(a), D–3(b) and D–3(c).

Peter Nils Baylor, Nutter, McClennen & Fish, Boston, Mass., for Trustee.

Joel Lewin, Snyder, Tepper & Comen, Boston, Mass., for Deja Vu, Inc.

Guy B. Moss, Widett, Slater & Goldman, Boston, Mass., for Creditor's Committee of Deja Vu, Inc.

Daniel M. Glosband, Goldstein & Manello, Boston, Mass., for debtors-Harbour House.

## MEMORANDUM ON STATUS OF DEJA VU, INC. RE HARBOUR HOUSE OPERATING CORP. AND HARBOUR HOUSE REALTY CORP.

HAROLD LAVIEN, Bankruptcy Judge.

This case first came before the Court when the two entities, Harbour House Operating Corp. and Harbour House Realty Corp., filed voluntary Chapter 11 petitions on March 24, 1982. Harbour House Realty Corp. (Realty) is the record owner of a hotel premise known as the Harbour House Hotel located in Lynn, Massachusetts. Harbour House Operating Corp. (Operating) is the operator of the hotel facility. The significance of the two different entities will come out later in this opinion. The Harbour House Realty Corp. and Harbour House Operating Corp. are being jointly administered. (Hereinafter the two entities will be referred to collectively as the "Harbour House").

1. An examiner was also appointed in this case and he has filed a lengthy report.

Shortly after the two Chapter 11 petitions were filed, the debtors filed a motion to reject an executory contract between the debtors and Deja Vu, Inc. (Deja Vu). Deja Vu is a Massachusetts corporation which operates a lounge and nightclub on the premises of the Harbour House Hotel. The day the Court was to hear the motion to reject the executory contract, Deja Vu filed a voluntary Chapter 11 petition and the proceeding was stayed.

Both debtors have now filed complaints for relief from stay. Ultimately, Harbour House seeks to dispossess Deja Vu, contending that control of the lounge is essential to any successful reorganization and by contrast, Deja Vu seeks to have its right to operate the lounge under a lease affirmed as necessary to a successful reorganization. The demographics add force to the arguments since the hotel is a small operation of only 91 rooms, while the lounge may be the tail that wags the dog with its 1200 person seating capacity. Deja Vu was granted partial relief from stay so that a proceeding in the Essex Superior Court, Commonwealth of Massachusetts, entitled *Joseph Cataldo and Deja Vu, Inc. v. Christopher P. Recklitis, Harbour House Realty Corp., and Harbour House Operating Corp.*, could continue. Many of the issues which are now being raised before the bankruptcy court had been raised in that lawsuit. Since that lawsuit had already been assigned to and had been partially heard by a state court master, the stay was lifted so that the proceedings before the master could be completed and his report filed.[1]

A master's report has now been filed. The findings of fact have been affirmed and adopted by this Court after a hearing on objections. Whatever objections now remain are to questions of law or damages. A trustee has been appointed for the Harbour House debtors and he has supplanted the debtor-in-possession as the party in this proceeding.

From May 18th to June 21st, 1982, the master held hearings on an almost daily

basis and there were over 33 separate transcripts. The master's report is over 100 pages in length. Therefore, only the relevant findings of fact will be discussed in this memorandum. All of the findings of fact in the report have been adopted, but not the conclusions of law or findings as to damages. The parties have briefed their respective positions. The following issues of law remain to be determined by this Court. First, the Court must determine whether the agreement between Deja Vu and Harbour House creates a leasehold interest in favor of Deja Vu and if so, what rights Deja Vu and Harbour House have in this lease under the Bankruptcy Code. Second, the Court must determine what rights and amounts of recovery Deja Vu has against Harbour House under various oral and written contracts. Finally, the Court must determine whether any of Deja Vu's claims are secured by virtue of an equitable lien on the real property.

To understand the issues, a summary of the master's findings is necessary to present a factual background. In the fall of 1980, Joseph Cataldo (Cataldo), the principal officer of Deja Vu, negotiated with Christopher P. Recklitis (Recklitis), about operating or leasing the lounge in the Harbour House Hotel. Although Recklitis had no official management position with the Harbour House Hotel, and his exact legal relationship to Harbour House is less than clear, the master found that he acted on behalf of the hotel [2] and neither party has questioned his authority either as manager or agent to represent Harbour House. I find that in fact, he controlled the operations of Harbour House. The negotiations between the parties essentially arrived at the following terms: (a) the annual rental would be ten thousand ($10,000) dollars per month or one-third of the profits; (b) Harbour House would pay the expenses of utilities, taxes and insurance; and, (c) Cataldo would, at his own expense convert the lounge to a "disco" operation, which he estimated would cost one hundred fifty thousand ($150,000) dollars. In furtherance of the deal, Cataldo paid a security deposit of fifty thousand ($50,000) dollars and loaned forty-one thousand ($41,000) dollars to Harbour House. All of the above agreements were oral. Relying on the oral agreements, Cataldo, without waiting for the lease that was supposed to be drawn up by counsel for Harbour House, began the restoration of the lounge. In December, 1980, with the work well along, the parties met to review draft agreements but they were not signed due to various disagreements and Cataldo stopped work for a day or so. Cataldo, after oral assurances from Recklitis, continued working on the lounge. The master found that Cataldo spent one hundred seventy eight thousand ($178,000) dollars on the work. The lounge opened for business on December 23, 1980 and was destroyed in a fire the following evening.

The parties subsequently met in February, 1981 and Cataldo insisted that he receive one hundred fifty thousand ($150,000) dollars of the insurance proceeds. The master found that Recklitis agreed that Deja Vu would receive one hundred fifty thousand ($150,000) dollars of the insurance proceeds. Cataldo told Recklitis that he could do the necessary rehabilitative structural work on the lounge for one hundred thousand ($100,000) dollars, and he also agreed to do work to improve the hotel lobby for fifty thousand ($50,000) dollars, an area not related to the lounge premises.

On February 28, 1981, a Lease, Management and Consulting Agreement, and Tripartite Agreement were executed by the parties. The agreements were dated back to November 24, 1980. It is clear from an examination of the documents that whatever else they are and whatever ambiguities they may contain, they do not within their four corners constitute a lease of the lounge to Deja Vu.

The Tripartite Agreement presents the following technical structure. Harbour House.

**2.** The master called Recklitis a "self styled management consultant" to the Harbour

House Realty Corp., (Realty) which owns the real estate, leases the premises to Harbour House Operating Corp. (Operating). A Management and Consulting Agreement (Management Agreement) encompasses the arrangement between Operating and Deja Vu for Deja Vu to manage and operate the lounge.

██ When an owner of an estate in land grants to another the right to possession of the property, retaining a reversion, the transaction is a lease. I *American Law of Real Property* § 3.2 at 177 (1952). In order for the lease to be anything more than a tenancy at will, it must be in writing. Mass.Gen.Laws ch. 183 § 3. A lease of land conveys an interest in land, requires a writing to comply with the statute of frauds, and transfers possession. *Baseball Publishing Co. v. Mattie B. Bruton,* 302 Mass. 54, 18 N.E.2d 362 (1938). If the instrument does not grant possession, but grants only the right to use the premises, then the instrument is a license not a lease. *Jones v. Donnelly,* 221 Mass. 213, 217, 108 N.E. 1063 (1915). The only document Deja Vu has which could evidence a lease is the Management Agreement. The usual test of whether a document is a lease is whether the instrument gives the so-called lessee exclusive possession of the premises. *Gerould Co. v. Arnold Constable & Co.,* 65 F.2d 444, 446 (1st Cir.1933); *Roberts v. Lynn Ice Co.,* 187 Mass. 402, 406, 73 N.E. 523 (1905). Although Deja Vu argues that it had a right to exclusive possession, the Management Contract states that:

> It is Manager's (Deja Vu) function to manage the operation of the Lounge; it is understood that this will be done *according to standards and criteria acceptable* to Manager and *Harbour House* (emphasis added).

The language does not indicate that Deja Vu is to have exclusive possession. Further, while not determinative, the usual terms of conveyance, such as "grant", "lease", "let", or "demise" are not in the Management Agreement. Instead, the Agreement provides that Deja Vu will furnish "operational and consulting services in connection with the conduct of the food, beverage, entertainment and pool operations at the lounge...." The Agreement is carefully drafted not to be a lease. The evidence indicates and the master found that it was intentionally drafted this way because Operating owned the liquor license and a liquor license cannot be transferred without approval of the regulatory authorities and, further, the lessee must be the licensee. Mass.Gen.Laws ch. 138 § 23. Master's Report, at 59–60. If Deja Vu was the lessee, the license would have to be transferred to it and this was something Harbour House was unwilling to do. Counsel for Harbour House made it clear that the documents were drafted to protect the liquor license and, although Cataldo may not have been happy with the changes, he accepted the changes when he executed the documents.

██ Deja Vu argues that the Court should look to the actions of the parties to determine whether a lease existed. In November, 1980, when Cataldo and Recklitis first came to an agreement, Cataldo began the work on the lounge partially in reliance on the eventual execution of a lease. However, when the agreements were first drafted by Harbour House's attorney, there was substantial disagreement as to the terms and nothing was signed. Cataldo continued to perform based on assurances from Recklitis that everything would be worked out. After the lounge burned in December, Cataldo had a claim to the insurance proceeds and could have walked away if unsatisfied with Recklitis' proposal. Yet, in February, after discussion with Recklitis, Cataldo agreed to rebuild the lounge and the hotel with full knowledge that his status was not that of a lessee. The Management Agreement, Tripartite Agreement and Lease were all executed prior to Cataldo's beginning the rebuilding work. At all times during this period, Cataldo was represented by competent counsel.

Cataldo knew that the Management Agreement was drafted so as to prevent any problems with the liquor licensing authorities. No evidence was presented that

in February, 1981, Cataldo refused to accept the form of the Agreement or that he was faced with a take it or leave it proposition. He could have walked away from the deal with his insurance claim and in fact, at one point, Liakos, the accountant for both Harbour House and Deja Vu, suggested that that might be the best approach. Instead, Cataldo signed the Agreement and began doing the restoration work. Both parties knowingly and deliberately for their own purpose entered into a management contract and not a lease. The bargaining took place at arms-length with both parties represented by counsel. The resulting agreement was not ambiguous as to this status and was deliberately structured not to be a lease. When the parties draft their agreements to deliberately present their status to the world as something other than their secret intent, they must bear the consequences especially when an element of so doing is the avoidance of a legal obligation; here, the transfer of the liquor license. *See Goldfarb v. Marchionne,* —— Mass.App. ——, 425 N.E.2d 401 (1981). I find that Deja Vu does not have a lease on the real property, but rather what it agreed to, namely, a management contract. This determination is additionally supported when Deja Vu's claim for payment is examined. Originally, when a lease was the subject of the negotiations, Cataldo was going to invest one hundred fifty thousand ($150,000) dollars of his own money for the renovation of the lounge. Under the new arrangement, the entire expense is to be borne by Harbour House who is to repay the original one hundred fifty thousand ($150,000) dollars plus an additional one hundred thousand ($100,000) dollars for the fire restoration. Incidentally, while not a determina-

tive fact, Deja Vu was not incorporated until February 13, 1981, so that it was not even a party in the original lease negotiations.

 The next issue the Court must determine is the amount of the claim Deja Vu has against Harbour House for the work it performed on the lounge and hotel. The master found that in February, 1981, the parties agreed to the following claims of Deja Vu: Deja Vu was to receive one hundred fifty thousand ($150,000) dollars as its share of the insurance proceeds and Cataldo, acting for Deja Vu, was to receive one hundred thousand ($100,000) dollars for rebuilding the lounge and fifty thousand ($50,000) dollars for work to be done in the hotel lobby. Recklitis promised Cataldo that the three hundred thousand ($300,000) dollars would come from the insurance proceeds. At the time he made that promise, Recklitis had already assigned one hundred thousand ($100,000) dollars of the proceeds and diverted thirty eight thousand, five hundred seventy four and 28/100 dollars ($38,574.28) that was supposed to be used to pay taxes to the City of Lynn.[3] Deja Vu argues that since Recklitis did not intend to pay it out of the proceeds, there was a material misrepresentation and a fraudulent inducement to perform the contract. Deja Vu claims that the proper measure of damages is the fair and reasonable value of the rebuilding, restoration and remodeling which the master found to be five hundred thirty-three thousand, seven hundred seventy-four and 04/100 dollars ($533,774.04). The alleged fraud which Deja Vu points to is the fact that Recklitis did not intend to pay out of the insurance proceeds. There was no misrepresentation as to the amount,

**3.** As to this money, the master made the following finding:

The total amount of the fire insurance proceeds paid by Holland America Insurance Company was $390,669.50.

Harbour House had represented the City of Lynn, Massachusetts was owed $54,543.14 in real estate taxes. The insurer turned over to Harbour House its check in that amount payable to the City of Lynn.

Harbour House, at the time, had pending an application for abatement of taxes. The check

was returned by the Tax Collector of the City of Lynn endorsed to Paula Modica, President of Harbour House. Modica substituted a check payable to the City of Lynn in the amount of $15,978.86. The Defendants thereby diverted to their benefit the sum of $38,574.28. Cataldo and Liakas were not made aware of this transaction by Recklitis or Harbour House. No part of the $38,574.28 was made available to Deja Vu at the time of its need in reconstruction. Master's Report, at 53.

nature or substance of the work to be performed. In fact, Liakos told Cataldo that he was "crazy" because doing the structural work would cost more than one hundred thousand ($100,000) dollars. Master's Report, at 33. Recklitis did not attempt to deceive Cataldo as to the amount or kind of work which had to be done. The parties bargained at arms-length as to the cost of the work. Deja Vu contracted to do the work for three hundred thousand ($300,000) dollars with full knowledge of the work to be done and the misrepresentation as to the form of payment does not entitle Deja Vu to recover more than it bargained for; otherwise, every time a person was not paid as promised, that person could then sue off the contract. In the case where there is an existing contract and the only breach has been in the obligation to pay, the proper remedy is an action for damages on the contract. *See Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Authority,* 7 Mass.App. 336, 341, 387 N.E.2d 206 (1979); *Green v. Boston Safe Deposit & Trust Co.,* 255 Mass. 519, 523, 152 N.E. 107 (1926). Here, Deja Vu's damages are the agreed three hundred thousand ($300,000) dollars due for the work which was performed.

■ Deja Vu next argues that it should be permitted to recover the five hundred thirty-three thousand, seven hundred seventy-four and 04/100 dollars ($533,-774.04) based on a theory of quantum meruit. Generally, the remedy of quantum meruit is invoked when there is no contract, or where the party furnishing service and materials finds the contract broken by the other party and considers it at an end. *Kass v. Todd,* 362 Mass. 169, 175, 284 N.E.2d 590 (1972). In April, 1981, the parties executed an addendum to the three agreements which provided that Operating, the landlord, would pay Cataldo one hundred fifty thousand ($150,000) dollars to restore the premises. Therefore, there was an express contract between the parties and quantum meruit by definition does not apply. The

work was substantially complete when the lounge was able to re-open on May 7, 1981, and the only breach was the failure to pay by Harbour House.

The next issue the Court must resolve is Deja Vu's claim that it is entitled to an equitable lien on the real property of the debtors. Deja Vu's claim is first based on promises of Recklitis that a mortgage would be given for the sums owed for reconstruction. Additionally, the April 30, 1981 addendum provided that Cataldo could request a promissory note in the amount owed secured by a mortgage on the property. The execution of the note and mortgage were conditioned on the occurrence of three events: (1) the expiration of the notice of contract that Deja Vu had placed on the project, (2) the completion of the reconstruction work and (3) Cataldo had to request the note and mortgage. The mortgage was also supposed to be superior in priority to any interest of Carroll M. Lowenstein and/or CML Realty Trust which had a third mortgage on the property. Finally, Deja Vu argues that it had a lien on the property in the form of a statutory Notice of Contract which lien Deja Vu was induced to terminate through misrepresentation of Recklitis.[4]

On all of these facts, Deja Vu, except for bankruptcy, might well have an unperfected right to a mortgage; however, the Court need not consider this issue because the intervening bankruptcy changes the rights of the parties. Under 11 U.S.C. § 541, all the property of the Harbour House debtors became property of the estate. The estate is a separate entity from the pre-bankruptcy debtors. *See In re Robinson's Wines & Liquors, Inc.,* 2 B.C.D. 50 (E.D.N.Y.1975) (debtor in possession is a different entity from debtor). It has long been recognized in bankruptcy law that equitable liens will not be valid where available means of perfecting legal liens have not been employed. Allowing an equitable lien is an unfair result for unsecured creditors who have dealt

---

**4.** Cataldo filed the Notice of Contract on February 17, 1981. The Notice was removed as part of a settlement agreement in a separate state court action. Part of the inducement was that the Deja Vu mortgage, if any, would be senior to the Lowenstein mortgage up to $150,000.

with the debtor without knowledge of the secret lien. Legislative History to § 60(a)(6) Bankruptcy Act of 1898 (repealed 1978), House Report No. 1293, 81st Cong., 1st Sess. (1949).

■ Congress has recognized the importance of protecting creditors from secret or equitable liens by giving the trustee, as of the commencement of the case, the status of a bona fide purchaser of real property. 11 U.S.C. § 544(a)(3).[5] Under this section of the Code, the trustee can avoid unrecorded interests. *In re Trotta,* 12 B.R. 843, 8 B.C.D. 187 (Bkrtcy.D.Conn.1981). An equitable lien would not be valid against a bona fide purchaser since the purchaser has no notice that such a lien exists and the trustee may avoid such a lien. *In re Mazzetti,* 22 B.R. 538, 9 B.C.D. 686 (Bkrtcy.E.D.Mich. 1982); *see also In re Hastings,* 4 B.R. 292, 6 B.C.D. 401 (Bkrtcy.D.Minn.1980).

■ Deja Vu argues that the recording of a lis pendens should be sufficient notice to overcome the trustee's status as a bona fide purchaser and to give priority status to its claim. In Massachusetts, the filing of a lis pendens as regulated by statute does not create a new right, interest or remedy, but is designed to insure that "a prospective third party transferee can, with the exercise of reasonable prudence, acquire information relevant to a decision whether to consummate a transaction." *Debral Realty, Inc. v. DiChiara,* 383 Mass. 559, 420 N.E.2d 343, 346 (1981). While the recording of the lis pendens puts a prospective purchaser on notice of a possible defect in title, the lis pendens itself not a lien on the property and does not affect the right of the trustee under the bankruptcy law. Section 544(a) specifically states that the trustee shall have the right of a bona fide

purchaser "without regard to any knowledge of the trustee or of any creditor." Implicit in that status is the trustee's power to avoid equitable interests if such interest would not be enforceable under applicable state law.[5a] In Massachusetts, an unrecorded mortgage, which as between the parties would be a valid equitable interest, is invalid against third parties who do not have actual notice. *Tramontozzi v. D'Amicis,* 344 Mass. 514, 517, 183 N.E.2d 295 (1962); *Lamson & Co., (Inc) v. Abrams,* 305 Mass. 238, 244, 25 N.E.2d 374 (1940). This approach is analogous to the cases on consignment where title as between the parties was never intended to be in the debtor, yet without proper recording the trustee's rights defeats those of the consignor. *In re International Mobile Homes of Johnson City, Inc.,* 1 B.C.D. 131 (Bankr.E.D.Tenn.1974). *See also In re Vodco Volume Development Co., Inc.,* 567 F.2d 967, 971 (10th Cir.1978) (allowing trustee to avoid a security interest where a continuing financing statement was filed late based on his status as a "hypothetical creditor").

Further, under § 544 the trustee is more than just a bona fide purchaser. Under § 544(a)(1) and (2), the trustee is given the status of levying judgment creditor. The lis pendens as notice, not a property interest, would not defeat a levying judgment creditor and would therefore not be valid against the trustee under the Bankruptcy Code.

■ In any event, the lis pendens only gave notice of the lawsuit which this Court is now deciding. It is something of boot strap argument to say that the trustee's title is somehow subordinate to a mere notice of a suit to enforce a possible right to a security interest when he would not be

**5.** 11 U.S.C. § 544

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(3) a bona fide purchaser of real property from the debtor, against whom applicable law

permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.

**5a.** *See In re Hotel Associates,* reversed by the Third Circuit Court of Appeals, *McCannon v. Marston,* 679 F.2d 13 (3rd Cir.1982), based on the law of Pennsylvania giving special status to the purchaser in actual possession of the realty.

bound by an actual mortgage given by Harbour House to Deja Vu of which he had actual notice but which was not recorded before filing. I find that Deja Vu is not entitled to an equitable lien on the Harbour House to secure its claim.

There are other findings of the master which have not been objected to by either party, which should be set out in this decision on the status of the parties. The master made the following findings which I adopt:

(a) Deja Vu is owed $41,000 for the loan Cataldo made on its behalf to Harbour House.

(b) Deja Vu has on deposit with Harbour House in the amount of $50,000 as a security deposit which may be used to offset any sums owed under the management contract.

(c) Harbour House is entitled to recover $91,492.49 on its counterclaim which includes claims for past due charges under the management contract.

The state court also considered two motions requesting that the defendants be found in contempt of that court's orders. The first motion was found to have been waived by Deja Vu. On the second motion, the master found that the defendants were in contempt of the court's order and that the plaintiff's had suffered damages of $20,060.00. The master subsequently amended his findings of damages to $85,680. This Court has not been informed of any final order having been rendered by the state court. The master made no distinction between the individual defendants and the corporate defendants in his contempt finding. Since any order of contempt issued by the state court would be aimed at preserving the integrity of its procedures, it is not appropriate for this Court to substitute its judgment for the state court's contempt order. Therefore, I will leave it to the state court to clarify the liability of the respective parties for contempt and allow

any final contempt judgment against Harbour House to be allowed as an unsecured claim. To the extent that the contempt may involve the debtors, relief from stay is granted for any findings of contempt to be made by the state court.

In summary, Deja Vu has a total claim of $391,000 [6] against which the Harbour House claim of $91,492.49 may be offset for a total claim of $299,507.51. Deja Vu should file a proof of claim within thirty (30) days.

A further hearing will be held on January 7, 1983 at 11:00 A.M. to consider the status of these three Chapter 11 debtors as that status may be affected by these findings and rulings and to determine any administrative claims between them.[7]

| Contract Recovery | $300,000 |
|---|---|
| Loan | 41,000 |
| Security Deposit | 50,000 |
| | $391,000 |

7. Earlier in these proceedings, this Court entered an order providing for a monthly payment from Deja Vu to Harbour House.