CAREY'S, INC. *vs*. M. LORRAINE CAREY.

No. 86-1120.

Plymouth.  November 16, 1987. — January 20, 1988.

Present: GREANEY, C.J., KAPLAN, & FINE, JJ.

*Tenants by the Entirety. Real Property,* Tenancy by the entirety, Option. *Husband and Wife. Option. Landlord and Tenant,* Estoppel by lease, Option to purchase. *Estoppel. Fraud.*

Discussion of the characteristics of a tenancy by the entirety under the law which governed prior to February 11, 1980, the effective date of St. 1979, c. 727. [294-296]

Under the law applicable prior to the effective date of St. 1979, c. 727, a lease and option agreement with respect to a parcel of land held by a husband and wife as tenants by the entirety could be executed validly by the wife alone with the husband's assent expressed by his signature on behalf of the lessee, a family corporation of which he was the principal manager. [296-297]

Where a wife executed a lease of a parcel of land of which her husband was the sole owner, and she thereafter accepted rental payments and asserted other rights under the lease, the wife's subsequent acquisition of an interest in the parcel on the death of her husband was sufficient under the doctrine of estoppel by lease to bind the wife to the lease and to an option to purchase contained therein, with regard to the interest acquired by her. [297-299]

In an action seeking specific performance of option agreements contained in four leases, the judge's warranted findings negated the defendant's arguments that the leases should be set aside because they were the product of undue influence, fraud, and misrepresentation on the part of the defendant's husband and others acting with him on behalf of the lessee, a family business of which her husband had been the principal manager. [299-300]

A judge did not abuse his discretion in granting specific performance of option agreements contained in leases of four parcels of land, and he correctly ordered that rental payments made after the defendant refused to honor the options be applied as credits against the purchase price. [301]

A judge had power under either Mass.R.Civ.P. 60 (a) or 60 (b) (1) to amend a judgment for specific performance of an option agreement in

order to correct a computational error affecting the amount of money due. [301]


CIVIL ACTION commenced in the Superior Court Department on August 4, 1982.

The case was heard by *John D. Sheehan, J.*

*Victor Bass (Molly H. Sherden* with him) for the defendant.

*Jerome M. Leonard (Elizabeth Paine* with him) for the plaintiff.

GREANEY, C.J. We affirm the judgment of the Superior Court ordering the defendant to convey to the plaintiff her interest in four parcels of real estate located in the towns of Whitman, Pembroke, and Randolph and in the city of Brockton.

A judge of the Superior Court sitting without a jury heard the case. His findings of fact may be summarized as follows.

The plaintiff, Carey's, Inc., has provided school bus service to Whitman, Pembroke, Randolph, and Brockton since the 1960's. The company was operated by two brothers, Fred Carey, Jr., the defendant's husband, and Paul Carey. Fred was the principal manager of the business and made all the major operational, policy, and corporate decisions.

The Whitman property was acquired by the plaintiff in February, 1964, as a facility for parking and servicing its school buses. The down payment for that property was paid by the plaintiff, but title was placed in the names of Fred Carey, Jr., and his wife, the defendant, as tenants by the entirety. All improvements to the property were paid for by the plaintiff, as were real estate taxes and other expenses. The defendant made the mortgage payments with money furnished to her each month by the plaintiff.

In 1967, the plaintiff purchased properties in Brockton and Randolph, again for exclusive use in its business. Title to those parcels was placed in the defendant's name alone. In 1969, the plaintiff acquired property in Pembroke, also for business purposes. Title to the property was placed in the name of Fred Carey, Jr. As was the case with the Whitman property, the down payments for the Randolph, Brockton, and Pembroke

properties were furnished by the plaintiff. Also all improvements, real estate taxes, and other expenses pertaining to those properties were paid by the plaintiff, and the payments on the mortgages on each parcel were made by the defendant with payments received each month from the plaintiff.

In 1978, Fred Carey, Jr., advised his brother that he was arranging to have the four properties covered by leases so the company would be protected if anything should happen to either brother. The leases were to be given by the defendant, as lessor,[1] and would provide the plaintiff with options to purchase the properties "as a protection to the company." The arrangement was also intended to provide some income for the defendant.

Fred Carey, Jr., then instructed the plaintiff's attorney, who had represented the plaintiff in the acquisition of the four properties, to prepare four leases, one for each property. Fred furnished an outline of the provisions of the leases, which were to be identical in form except for the amount of monthly rent and the purchase price in each option. He made it clear to the attorney that the plaintiff was to continue to retain full control of the properties. Fred stated that because he and Paul had been equal owners of the business, he wanted to ensure that if anything happened to either of them, the surviving owner would have complete control of the plaintiff's real estate. Fred also indicated that he intended to provide some income for his

---

[1] The defendant was named as sole lessor on all four leases because Fred Carey, Jr., and his attorney and accountant were operating under the erroneous belief that title to all four properties had been placed in the defendant's name alone. Apparently, no title search or other check on title was done before the leases were drawn.

The four leases had an initial term of four years and provided for options to extend for five terms of five years each. Upon the plaintiff's exercise of each option to extend, there would be an increase in the annual rent in accordance with a formula set forth in the particular lease. The leases also provided for two successive options to purchase lasting ten years. If an option was exercised within ten years from the date of the lease, the price would be the price identified in each lease for the specific property. If an option were exercised between ten and twenty years after the date of the lease, the price was established by a formula set forth in the lease. The purchase price for each property was to be paid to the defendant.

wife by means of the lease arrangements. The leases were prepared in early 1978 and backdated to August 31, 1977, the end of the plaintiff's 1977 fiscal year. The leases were "triple net"; that is, all improvements and expenses of every kind were to be borne by the plaintiff, with the defendant to receive monthly rental payments free of any deductions.

On January 24, 1978, the defendant, at Fred's request, went to the office of the plaintiff's attorney to review and execute the leases. Fred requested that the defendant be accompanied by their daughter Candace. Of the six Carey children, Candace had the closest relationship to her mother and also possessed the most business experience.

At the attorney's office, the provisions of the leases, including the options to purchase, were explained to the defendant, after which the leases were executed by her. The judge's findings as to what transpired at that important meeting, and other considerations relevant to the issues on appeal, are set forth in the margin.[2] Subsequently, four notices of lease were pre-

---

[2] "On or about January 24, 1978, Mrs. Carey and her daughter, Candace Carey, went to the office of Attorney Joseph Flynn in Rockland, Massachusetts. There they met Kenneth Kane [the plaintiff's accountant] and Attorney Joseph Flynn [the plaintiff's attorney]. The four leases were produced, and Kenneth Kane sat in the library with Mrs. Carey and Candace Carey discussing the terms of the leases. This session lasted approximately two hours.

"Mr. Kane explained the provisions of the leases to Mrs. Carey, clarified the numbers, told her about the documents she was signing and what they provided, and asked Mrs. Carey if she had any questions. Mr. Kenneth Kane told her what the rental income would be and what the option prices were for each of the parcels. He also told Mrs. Carey what the individual rent was for each of the four parcels, what the total would be from the four parcels, what the individual option provisions were on each lease and what the total provisions for the options were for the four leases.

"Mr. Kane told Mrs. Carey what the function of the option price was in relationship to the rental payments. During the two-hour conference in the library of Mr. Flynn's office, the four leases were present in front of both Candace Carey and Mrs. Carey and were in her hands for a portion of that time. In fact, they were always available to her.

"During the conference in Mr. Flynn's library, Mr. Flynn was in and out of the library. Mr. Kane explained to Mrs. Carey that the leases provided her with an element of protection which she did not have before the leases were executed. The properties had a unique value to a school bus company and were developed as special purpose properties. Further, there was always the danger of losing a school bus contract. Mrs. Carey did not feel she was

pared, executed, and recorded in the appropriate registry of deeds.

On July 18, 1978, Fred Carey, Jr., died suddenly. The defendant consulted an attorney about her rights under the leases. On December 21, 1978, this attorney wrote to Paul Carey, requesting that the defendant be reimbursed for taxes paid by her in 1977 under the leases. The amounts requested by the defendant were paid. In March, 1979, the defendant consulted a second attorney, who requested additional payments under the retroactive application of the leases. These sums were also acknowledged by the plaintiff as appropriate and were paid. Between January, 1978, and April 30, 1985, the plaintiff paid the defendant rent under the leases totaling $83,598.88.

On May 21, 1982, the plaintiff notified the defendant that it was exercising the options contained in each of the four leases. The defendant consulted her attorney, who advised her not to recognize the validity of the options. On August 4, 1982, the plaintiff brought this lawsuit, seeking specific enforcement of the options and damages.

1. *The Whitman property.* It will be recalled that on August 31, 1977, the date of the lease to the Whitman property, title to that property was held by the defendant and her husband as tenants by the entirety. The lease to that property was signed by the defendant alone. In view of the these facts, the defendant argues that her purported lease and the option are void because she was under a disability due to coverture.

The characteristics of a tenancy by the entirety in Massachusetts were well-settled in 1977.[3] In *Licker* v. *Gluskin,* 265

under any pressure or duress from Mr. Kane, Mr. Flynn or her daughter Candace to execute the four leases and did so of her own free will.

"The leases were in fact executed in January of 1978 by Mrs. Carey in the offices of Attorney Flynn, and the genuiness of the signatures is admitted.

"Neither Mr. Kane nor Mr. Flynn had any personal or business interest in the lease option agreements, and Mr. Kane fully explained the terms, meaning, and legal significance of the agreements to Mrs. Carey. There is no evidence that any facts were concealed from Mrs. Carey or that full disclosure was not made to her."

[3] Chapter 727 of the Acts of 1979 considerably revised G. L. c. 209, § 1, to alter the attributes of a tenancy by the entirety. The revisions took

Mass. 403, 404 (1929) (quoting from *Bernatavicius* v. *Bernatavicius,* 259 Mass. 486, 487 [1927]), those characteristics were summarized as follows:

> "A conveyance to a husband and wife as tenants by the entirety creates one indivisible estate in them both and in the survivor, which neither can destroy by any separate act. . . . Alienation by either the husband or the wife will not defeat the right of the survivor to the entire estate on the death of the other. There can be no severance of such estate by the act of either alone without the assent of the other, and no partition during their joint lives, and the survivor becomes seised as sole owner of the whole estate regardless of anything the other may have done."

See also *Pineo* v. *White,* 320 Mass. 487, 490-492 (1946). In addition, prior to February 11, 1980, "the husband [was] during their joint lives entitled to the exclusive possession of real estate owned by the husband and wife as tenants by the entirety," *Licker* v. *Gluskin,* 265 Mass. at 406, that is, he had "full control of the property and the returns from it during his lifetime." *West* v. *First Agricultural Bank,* 382 Mass. 534, 543 (1981).

Thus, generally, in 1977, any attempted conveyance of property held in a tenancy by the entirety by one tenant during the lifetime of the other was void. Both spouses had to join in a deed in order to convey the entire estate and destroy both survivorships. See *Pierce* v. *Chase,* 108 Mass. 254, 258 (1871); *Licker* v. *Gluskin,* 265 Mass. at 404-407; *West* v. *First Agricultural Bank,* 382 Mass. at 536 n.4. However, the husband, acting alone, could dispose of his right to control and profits of the property during his lifetime and of his survivorship. Although the wife could not dispose of her survivorship by her sole act, she could do so with "the assent in writing of the husband." *Licker* v. *Gluskin,* 265 Mass. at 406-407. See *West, supra* at 536 n.4.

---

effect on February 11, 1980, and are not applicable to the facts of this case. See *West* v. *First Agricultural Bank,* 382 Mass. 534, 535, 542-552 (1981); *Turner* v. *Greenaway,* 391 Mass. 1002 (1984).

In addition, where one spouse conveyed his or her interest in a tenancy by the entirety to the other spouse, a deed signed only by the former and the oral assent or acceptance of the deed by the latter were sufficient to effect the conveyance. In *Donahue* v. *Hubbard,* 154 Mass. 537, 537-538 (1891), the court approved of a husband's releasing all his rights in a tenancy by the entirety to his wife. The initial conveyance was made to a third party by means of a quitclaim deed signed only by the husband. The third party, on the same day, executed and delivered a quitclaim deed to the wife. The court reasoned that both conveyances "were made with the knowledge and oral assent" of the wife and held that title was thereby vested solely in her. *Id.* at 539. In *Hale* v. *Hale,* 332 Mass. 329 (1955), the court concluded that a wife could convey to her husband all right, title, and interest in property held by them as tenants by the entirety. The court reasoned that conveyance to one's spouse differed from conveyance to a third person, as the latter would impair the spouse's rights, whereas conveyance to one's spouse would add to the spouse's rights. The court held that "acceptance in such a case by one spouse of the other's deed operates as an assent to the conveyance." *Id.* at 332. See v. *Bernatavicius* v. *Bernatavicius,* 259 Mass. at 487.

With regard to leases made by the wife during the husband's lifetime of property owned as a (pre-1980) tenancy by the entirety, it was held in *Cunningham* v. *Ganley,* 267 Mass. 375, 377 (1929), that an oral agreement regarding the occupation and entitlement to profits of property held in the tenancy by the entirety did not give the wife alone power to execute a lease and collect rents. The court, however, implied that if the husband had made an agreement in writing, it might have estopped him from denying the validity of the lease executed by his wife. *Ibid.* See also *Pray* v. *Stebbins,* 141 Mass. 219, 222-224 (1886); *MacNeil* v. *MacNeil,* 312 Mass. 183, 184-185 (1942).

We think it follows from these decisions that in 1977, since a valid lease could be made of property held in a tenancy by the entirety when the wife executed the lease and the husband

assented,[4] and since a conveyance could be made by the wife of her right of survivorship with the written assent of the husband, a valid lease of the property and option to purchase of the defendant's right of survivorship could also be made in the same manner.

In this case, the leases with options to purchase which were signed by the defendant were Fred Carey's idea. He put the plan into effect by means of express directions to the plaintiff's corporate accountant and attorney. Fred Carey directed the defendant to the attorney's office to sign the leases. He signed the leases and notices of leases on behalf of the plaintiff. These written expressions of assent satisfied the requirements stated in the decisions previously discussed, and gave the plaintiff valid lease and option rights to the Whitman property.[5] See and compare *Child* v. *Sampson,* 117 Mass. 62, 63 (1875) (signature by husband as subscribing witness to lease constituted assent in writing under statute requiring husband's assent in writing); *Chapman* v. *Miller,* 128 Mass. 269 (1880) (insertion of husband's name in last clause of mortgage, with his signature, constituted assent in writing making wife's conveyance of real estate valid under statute requiring husband's assent in writing to wife's conveyance of real estate).

2. *The Pembroke property.* Title to this property stood, on August 31, 1977, in the name of Fred Carey, Jr., alone. The defendant had no title to the property and, therefore, nothing to lease. Upon Fred's death, title to the property passed to the defendant and her children as tenants in common. The judge

---

[4] The decisions are unclear as to whether the husband's assent to a lease had to be in writing or whether oral assent would be sufficient. We need not be concerned with the issue, as the facts of this case would satisfy any evidentiary requirement that an assent must be in writing.

[5] The judge reached the same conclusion regarding the Whitman property on the basis of the doctrine of estoppel by lease, assuming a possibly defective lease which was cured by the defendant's acquisition of full title upon her husband's death. We do not find it necessary to explore the application of the doctrine to the facts concerning the Whitman property, as the approach we have discussed in the text supports the judge's decision on the basis of a lease and option to purchase which was valid.

ruled that the defendant's subsequent acquisition of an interest in the property was sufficient, on the basis of estoppel, to bind her to the lease and the option to purchase with regard to the portion of the property owned by her. The defendant argues that the judge incorrectly applied estoppel principles in requiring her to convey her portion of the property. We disagree.

The doctrine of estoppel by lease, as a corollary to the doctrine or estoppel by deed, is accepted law in Massachusetts. See *Susse Chalet Inn of Holyoke, Inc.* v. *Howard D. Johnson Co.,* 12 Mass. App. Ct. 31, 35-36 (1981), and authorities cited therein. As a general principle, a lease made by a lessor at a time when he has no title ordinarily will operate by way of estoppel on an after-acquired title of the lessor, so as to confer on the lessee, during the lease term, the ability to enforce the lessee's rights under the lease. See Hall, Massachusetts Law of Landlord and Tenant § 9 (4th ed. 1949). See also Schwartz, Lease Drafting in Massachusetts §§ 2.2, 2.3 (1961). The doctrine protects the lessee's right to full possession and use of the leased premises during the term, a right derived from the covenant of quiet enjoyment, which is implied in every lease. See *H.W. Robinson Carpet Co.* v. *Fletcher,* 315 Mass. 350, 353 (1943); *Simon* v. *Solomon,* 385 Mass. 91, 102 (1982). Allowing a lessor to rely upon his lack of title at the time of the execution of the lease to avoid the lease, even though the lessor has subsequently acquired title, would violate the covenant of quiet enjoyment, see *Westland Housing Corp.* v. *Scott,* 312 Mass. 375, 381 (1942); see and compare *Dyecraftsmen, Inc.* v. *Feinberg,* 359 Mass. 485, 489 (1971), justifying an estoppel to prevent an injustice. See 1 American Law of Property § 3.48 (Casner ed. 1952). This is the case here.

Moreover, this is an especially appropriate case to apply the rule because the defendant accepted rental payments under the Pembroke lease both before and after she acquired her share of the title, and she asserted rights under the lease (after requesting and receiving legal advice) for additional payments she thought lawfully due her. The estoppel thus also validates the option rights contained in the lease and is sufficient to require the defendant to convey her interest in this property to the

plaintiff. (The order to convey, however, does not reach the interests of the children.)[6] See *Dennett* v. *Norwood Housing Assn.,* 241 Mass. 516, 521-522 (1922); *King* v. *Allen,* 9 Mass. App. Ct. 821, 822-823 (1980).

Contrary to the defendant's argument, the judge did not err in reducing by one-half the amount due on the Pembroke property. See *Cashman* v. *Bean,* 226 Mass. 198, 202 (1917); *Dennett* v. *Norwood Housing Assn., supra* at 521.

3. *Undue influence, fraud, and misrepresentation.* The defendant argues at some length that the leases should be set aside because they are the products of undue influence, fraud, and misrepresentation on the part of her husband and those he enlisted to accomplish his purpose, the company's attorney and accountant. She maintains that she was naive in business matters and accustomed to relying upon the advice of her husband and the plaintiff's attorney and accountant and that she was unfairly persuaded by the three men to enter into financially disadvantageous agreements. She further argues that she was fraudulently induced to sign the leases by virtue of the failure of her husband and his advisors (who she says should

---

[6] The judge actually ruled that the defendant was barred from opposing the plaintiff's request to enforce the option by the doctrine of "after-acquired" deed. This may have been a reference to the doctrine of estoppel by deed, a consideration which has led the defendant's counsel to argue that the lack of a requirement of a warranty deed in the option agreement defeats the application of the doctrine. See *Supraner* v. *Citizens Sav. Bank,* 303 Mass. 460 (1939); *Taylor* v. *Lassell,* 4 Mass. App. Ct. 539, 541-542 (1976). We need not reach the argument because, as has been discussed, the doctrine of estoppel by lease applies to support the decision.

The defendant also argues that the lease on the Pembroke property should be set aside because it (a) was the product of a mutual mistake of fact; (b) fails to reflect a meeting of the minds; and (c) lacks an essential term, namely, a provision identifying which party would bear the risk of loss if title should prove to be defective. There is some question whether these issues were actually tried. The judge's decision contains no discussion of them, and the defendant made no requests for rulings on these issues. There is a passing reference in the closing argument of the defendant's counsel to a mistake having occurred, and the judge who denied the plaintiff's motion for summary judgment alluded to some of the issues as possible issues for trial. However, we are satisfied, essentially for the reasons argued by the plantiff in its brief, that each of the issues lacks merit and, consequently, we see no need to discuss them in detail.

be deemed fiduciaries) to explain the significance of the options to her. Finally, she contends that the plaintiff, acting through agents, expressed dishonest opinions which she relied upon to her damage.

The defendant admits that she had the burden of persuasion on each of these contentions in order to avoid the consequences of leases, regular in form, which bear her signature. Her arguments are confronted at the outset by the judge's contrary findings of fact, which are fully supported by evidence he found to be credible. Those findings, particularly the findings relating to the signing of the leases and options, see note 2, *supra,* negate the defendant's arguments, each of which rests on views of the evidence that the judge rejected. Based on the judge's findings and the further considerations noted in the margin, we reject the arguments.[7]

---

[7] To be sure, Fred Carey, Jr., was found to be a dominant personality and the driving force behind the plaintiff's operations. There was some measure of confidence shown by the defendant in him and in the plaintiff's attorney and accountant. The relationship was not a fiduciary one but was confined to respect for the judgment of the three men and trust in their advice. See *Tracy* v. *Curtis,* 16 Mass. App. Ct. 910 (1983).

Doubtless, the explanations and assurances furnished by the accountant and attorney persuaded her that the leases were in her best interests. Influences directing a party's attention to contingencies which should be provided for by legal documents are not per se improper. "Such influences may be persuasive and effective, but, so long as not coercive, they are not undue." *Neill* v. *Brackett,* 234 Mass. 367, 370 (1920).

The properties were the exclusive business properties of the plaintiff, acquired, paid for, improved, managed, and maintained by it. The business was conducted exclusively by the defendant's husband and his brother. The leases provided a business advantage for the plaintiff and at the same time assured the defendant a steady source of monthly rental income. The options preserved the properties for the plaintiff as essential operating assets and assured Paul Carey, coowner of the business, the opportunity to continue the business without the risk of divisive disputes. The defendant's expert witness testified that the option prices had a reasonable correlation to the fair market values of the properties in August, 1977, when the leases were signed. Additionally, in response to a question by the judge, the defendant testified that she felt under no compulsion to sign the leases.

As has been noted, our conclusion that the judge's decision on these issues should not be overturned is also fortified by the defendant's acceptance of rents under the leases for almost five years and by her assertion, through legal counsel, of rights under the leases. These actions are additional evidence of ratification by her of, and an election to be bound by, the four leases. See *Rosenbloom* v. *Kaplan,* 273 Mass. 411, 416-417 (1930).

4. Based upon what has been said above, the judge did not abuse his discretion in granting specific performance. He could properly conclude, on the facts found, that affording that relief would not impose an undue hardship on the defendant or permit the plaintiff to obtain an inequitable advantage. See *Roberts-Neustadter Furs, Inc.* v. *Simon,* 17 Mass. App. Ct. 262, 270 (1983).

5. The judge correctly ordered that the rental payments, paid after the time the defendant refused to honor the options, were to be applied as credits against the respective purchase prices. The defendant was not entitled to additional sums as interest, because under the option agreements the installments on the purchase prices included interest. See *Richards* v. *Saveway Oil Co.,* 2 Mass. App. Ct. 514, 520 (1974).

6. We conclude that the judge had the power under either Mass. R.Civ.P. 60(a) or 60(b) (1), 365 Mass. 828 (1974), to correct the computational error in the judgment concerning the amount due on the Pembroke property.

The judgment, as amended, is affirmed.

*So ordered.*