Hershfang, J.
Plaintiff, Truck Center Leasing, Inc., sued to recover $7,500 it paid to defendant, Peter J. Fiumara, Sr., in connection with plaintiffs written offer to lease from defendant certain commercial property. Defendant counterclaimed, asserting that plaintiffs proposal became a lease on defendant’s acceptance, and plaintiff thus owes defendant rental for the fourteen months beginning November, 1987, and unpaid rent thereafter at the established rate of $7,500/month. The trial judge found for defendant on both plaintiffs claim and on defendant’s counterclaim. We affirm the judgment for defendant on plaintiffs claim but reverse on defendant’s counterclaim.
*17 For reasons to be elaborated upon later, we pay close attention to the factual details as reported by the trial judge; they are not in dispute.
In early September, 1987, plaintiff s president,Thomas H. Scott, looked at defendant[1] s 85 Market Street, Chelsea property, accompanied by defendant’s agent, Frank Green and, apparently, defendant’s son, Peter J. Fiumara, Jr. The premises comprised a 50,000 square foot lot with a 5,000 square foot building and a garage. Plaintiff was lookingforalocationfromwhichitcouldoperateitstruckleasingandrepair business. Soon after that visit, Scott, on plaintiffs behalf, wrote defendant the following letter dated September 10, 1987, which he gave to defendant’s agent, Green (hereafterto be referred to as the letter of offer):
We hereby offer to lease on a triple net lease basis your property at 85 Market St. Chelsea, Ma., for a period of three years (36 months) with the purchase option to purchase the property during the same period for one million three hundred thousand dollars ($1,300,000.00). This offer includes the assumption of the current SBA loan in the amount then open at the time of the exercise of the purchase option. The lease will commence on the first day of October 1987 (October 1,1987).
I enclose a checkfor the first months [sic] rent in the amount of $7,500.00. Your acceptance and endorsement of our check will constitute an acceptance of the above offer. If you find this offer unacceptable please return our check forthwith.
Thank you for your consideration of this offer.
A $7,500.00 check accompanied the letter of offer. On it were these words: “First Months rent — October 1987 at 85 Market St. Chelsea, Ma.” On receipt of that letter of offer, defendant endorsed and deposited the enclosed check.
There is nothing in the record with respect to the events of the next thirty-five days, even whether, for example, a key was turned over to plaintiff. It is established that plaintiff never occupied the premises.
On October 16,1987, more than half-way into that first month, Bernard P. Rome, Esq., defendant’s attorney, delivered a lease form (The Rome lease) undated, but with a three year term commencing fifteen days earlier, October 1, 1987. With it was a cover-letter addressed to plaintiff, defendant, and defendant’s son, Peter J. Fiumara, Jr. In its entirety, the letter says this:
I am sending each of you a copy of the lease for the premises at 85 Market Street, Chelsea, Ma. If I have not stated the terms correctly, please advise. If the terms are in accordance with your agreement with each other, then please execute the lease. If the security deposit of $7,500 and the first and last months rent of $15,000 has not as yet been paid, then that, of course, should be paid at this time, at the time of the execution of the lease.
The Rome lease comprised the four-page Greater Boston Real Estate Board Standard Commercial Lease form (Revised 1981) which, with additions in paragraph 23 (entitled “Other Provisions”), ran over to a fifth page. Included in that paragraph 23 and elsewhere in the Rome lease are these broadened or additional burdens imposed on lessee: that lessee pay the last month’s rent and a month’s security deposit; that beginning April, 1989, lessee pay the Small Business Administration’s (SBA) $2,650 monthly mortgage (i.e., beginning April, 1989, the rent would increase from $7,500 to $10,150/month); that lessee pay the real estate taxes (estimated at $550/month) monthly, in advance, the payment for November and December, 1987 to be made before November 1st; and that lessee must also pay a so-called cost-of-living escalation. In addition, the Rome lease required that lessee provide $1,000,000 fire insurance coverage and that Scott personally guaranty the lease.
*18 The Rome lease was never signed, nor did Scott otherwise respond to Rome’s letter. Another month passed. On November 19,1987 Rome wrote this to Scott.
We do not understand your failure to comply with the lease agreement thatyou executed on September10,1987, with Peter J. Fiumara, Sr. You paid the initial months [sic] rent of $7,500.00 and have not paid any rent since that date. You owe the rentfor November 1,1987 [and also the pro rata taxes of $1,650 through December, 1987.]
In any event, please let me know just whatyour intentions are with regard to the performance of your obligation.
Again, there was no response. Rome wrote Scott on December 11,1987, threatening suit:
I have not heard from you since [sending the November 19 letter],... I trust you will not make it necessary to litigate this matter.... If I do not hear from you within one week, I will conclude that you have no intention of honoring your obligation as set forth in detail in your letter of September 10, 1987, and we will proceed accordingly.
The week passed, as did about three more weeks until, by letter of January 6, 1988, plaintiffs attorney, John P. Connelly, Esq. wrote Rome in substance, at least for our purposes here, that the Rome lease went well beyond plaintiffs offer and was not acceptable or accepted. ‘The [Rome] lease agreement was never accepted and [plaintiff] never occupied [defendant's] property.” He demanded the return of the $7,500 and brought this suit seeking to recover it. Defendant counterclaimed for the unpaid rent. The premises, despite defendant's efforts after the January 6, 1988, letter, remained unrented.
Plaintiff timely filed requests for rulings. Their essence, as embodied in requests numbered one through four, is that as a matter of law [citing Reidel v. Plymouth Redevelopment Authority, 354 Mass. 664, 665 (1968)], plaintiffs letter of September 10, 1987 was not a binding lease but only an agreement to lease. The trial judge, relying on Goren v. Royal Investments, Inc. 25 Mass. App. Ct. 137 (1987), concluded that plaintiffs September 10, 1987 letter “contained all the necessary material terms to constitute an agreement and is binding on the plaintiff,” finding for defendant in each instance, and assessing damages on defendant’s counterclaim of $97,500 at the $7,500/month rental rate for the fourteen months after October, 1987, when the finding was filed.
We consider, in order, plaintiffs claim for a refund of his $7,500 payment and the defendant’s counterclaim for unpaid rent.
PLAINTIFFS CLAIM
Plaintiff grounds its claim for the return of its $7,500 wholly voluntary payment on the theory of unjust enrichment. In support, plaintiff characterizes its September 10, 1987 letter as not a lease but only an offer to enter into a lease which offer defendant rejected. In citing Reidel, plaintiff points to the rule of law that whether a writing constitutes a lease or only an offer depends on the intention of the parties as ascertained from the instrument as awhole. 354 Mass, at 665 (1968). Indeed, as it was just recently confirmed, “[t]he norm in real estate transactions has been that, when the parties sign a writing contemplating the later execution of a purchase and sale agreement, they do not intend to be bound until that time, [citations omitted]... The controlling fact, however, is always the intention of the parties [citation omitted] and that will normally present a question of fact for the judge.” Levenson v. L.M.I Realty *19 Corp., 31 Mass. App. Ct. 127, 130 (1991). The same rule applies to lease agreements. Rosenfield v. United States Trust Company, 290 Mass. 210, 216 (1935). See also Mendel Kern v. Workshop, Inc., 400 Mass. 277, 279 (1987).
However, in framing its claim on the ground of “unjust enrichment,” plaintiff misses the mark. Unjust enrichment is described and defined this way in National Shawmut Bank of Boston v. Fidelity Mutual Life Insurance Co., 318 Mass. 142, 146 (1945), (quoting AM. LAW INST. RESTATEMENT: RESTITUTION, §1, comment C:
Even where a person has received a benefit from another, he is liable to pay thereforonly if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.
Plaintiffs own words set the stage. By its September 10th letter of offer plaintiff conveyed an “offer to lease” enclosing a check “for the first months rent in the amount of $7,500.” Plaintiff alone chose the manner of defendant’s response. “Your [i.e. defendant’s] acceptance and endorsement of our [enclosed] check will constitute an acceptance of the above offer.” Fewer than twenty days remained from the receipt of that letter until the start of the October rental period. Defendant reacted in the precise way plaintiff asked, by endorsing and depositing the check. Nor is defendant shown to have acted thereafter in any way inconsistent with the expectation that plaintiff would occupy the space through the month of October, 1987. We do know that the space remained unoccupied and presumably was unavailable to anyone else during that month. We think it fair to conclude that during October, 1987, plaintiff’s letter with accompanying payment and defendant’s response in cashing plaintiffs check achieved exactly what plaintiff asked and paid for, namely, to take the premises off the market and to have it remain available exclusively for plaintiff. Under these circumstances, it is clear enough why plaintiff did not base its claim for a refund on the grounds of a breach of contract. For there was none. Rather, plaintiff attempts to recapture its voluntary payment under the guise of unjust enrichment. But plaintiff has cited no case nor otherwise supported in logic how there was any unjust enrichment by defendant at plaintiffs expense. Cf., National Shawmut Bank v. Fidelity Mutual Life Insurance Co., supra, and Barry v. Covich, 332 Mass. 338, 342 (1955). Thus, on plaintiffs claim the finding for defendant was warranted.
DEFENDANTS COUNTERCLAIM
The perspective and the burden switches when we consider defendanf s counterclaim.
As already noted, in finding for defendant the trial judge, citing Goren v. Royal Investments, Inc., supra, concluded that plaintiffs letter of offer “contained all the necessary material terms to constitute an agreement” and that “the letter constitutes a binding agreement to rent the premises.” Not so, plaintiff counters. In Goren, the parties had exchanged five drafts of documents over the course of a month, had considered and agreed upon the details of the proposed lease and had agreed to be bound by those terms. Thus, in Goren the extensive negotiations and drafts created a sound basis for concluding that the parties intended to be bound. This case, plaintiff claims, is more like Goren’s obverse, Blomendale v. Imbrescia, 25 Mass. App. Ct. 144 (1987), where, despite detailing the substance of a proposed lease, “various warranties [later] asked of the seller by the buyer reflect imperfect negotiations at the time of the original agreement. The buyer introduced new elements which had not been discussed, let alone agreed upon. Itfollows thatthe parties did not intend to be bound by the preliminary document.” Blomendale, at 147.
In considering whether to tilt in the one direction or the other, we return to the principle that governs both Goren and Blomendale, confirmed more recently in Levenson v. L.M.I. Realty Corp., supra, namely, what did the parties intend?
*20 On its face, the plaintiffs letter of offer is unambiguous. In it plaintiff proposes to lease the described property for three years at $7,500/month beginning October 1, 1987 on a triple-net-lease basis, and requests an option to buy that property for $1.3 million dollars during that period. In essence, plaintiff could be considered as having proposed that defendant do this: accept this offer by depositing the enclosed $7,500 checkfor the first month’s rent and we have a deal. When the defendant then endorses and deposits the check, the deal is done.
But, what exactly is that deal? More important, and despite the apparently unambiguous language of plaintiffs letter and defendant’s reaction in endorsing and depositing the check, what did the parties intend? Or put differently, what did they contemplate would happen next?
As we see it, the parties were contemplating an expensive, two-tiered business agreement, a three-year lease and an option to purchase for 1.3 million dollars. If the lease ran the full three years, it would cost the lessee two hundred seventy thousand dollars ($270,000) plus whatever additional payments would be due under the “triple net” terms.
Under the circumstances, did the two parties intend to be bound to those substantial responsibilities only by the three substantive sentences that appear in the first paragraph of plaintiffs letter of offer without resort to a further writing to cover the details of both the lease and proposed option terms? While, unlike Blomendale, there was no mention of an agreement form to follow, or who would be responsible for its drafting, the bare terms of the letter of offer do not include provision for critical, and not merely ministerial,” terms. Blomendale, supra at 146.
By way of example only, in the context of their undertaking, exactly what did the three words “triple net lease” mean? (While by then at least one court elsewhere had interpreted “triple net lease” as requiring a tenant to pay for taxes, maintenance and insurance costs, Butler Products Co., Inc, v. Roush, 153 Ariz. 500, 501 [1987], the only reference we could find in a Massachusetts appellate decision appears in Carey’s Inc. v. Carey, 25 Mass. App. Ct. 290, 293 [1988], decided in the year after these events and simply stating but not explaining the meaning or application of the phrase.) If lessee was to pay for insurance, what kind(s) would be required and how much coverage would be necessary? (The Rome lease sought to require $1,000,000 of fire insurance.)
Similarly, the letter of offer said nothing about other lease terms normally expected to be included in a commercial lease of the value involved here and which the Rome lease sought to cover in its more than four finely printed pages. Or, with respect to the $1.3 million purchase option, where were any assurances concerning the state of title, requirements for ongoing mortgage payments and the like?
But we do not decide on these imperfectly described or omitted terms. For we believe the question is not whether the letter of offer contained all the terms of an agreement that could in the abstract bind the parties. It is, rather, whether these parties intended to be bound by that letter of offer. Unlike the cited Reidel, Blomendale, Goren or Levenson cases, where intention had to be determined, or divined, from surrounding circumstances, how these parties acted, and, more particularly, what this defendant, who seeks to bind plaintiff, actually did or wrote, we believe clearly exposes his intention and expectation. In this respect, we consider it self-evident that the parties could not be viewed as intending or expecting a result that defendant himself did not intend or expect. We return to consider the facts from that perspective.
The deal would have brought defendant more than a quarter-million dollars, more than five times that had plaintiff opted to buy the property. Yet, as noted, the first step of record taken by defendant occurred on October 16, 1987, thirty-six days after defendant was given plaintiff’s letter of offer, and more than halfway through the month for which plaintiff had paid defendant seventy-five hundred dollars rent. In the meantime, the space remained unoccupied. We don’t even know if plaintiff was given a key.
*21 That first step was to send the Rome lease. In the cover letter accompanying it, Attorney Rome three times describes it as “the lease.” In the context of the parties’ action (and inaction, including the still empty space), the very existence of the Rome lease and the description given it by defendant’s counsel (“the lease”) we believe is strong support for the view that the parties contemplated that the letter of offer would in fact be followed by a later, more detailed writing. That expectation, as noted earlier, is evidence of an intent not to be bound “by the preliminary document.” Blomendale at 147. To like effect is Levenson at 130. (‘The norm in real estate transactions has been that, where the parties sign a writing contemplating the later execution of a purchase and sale agreement, they do not intend to be bound until that time.”)
Not unexpectedly, the Rome lease purports to flesh out the bare terms of plaintiff s letter of offer and of the hoped-for future relationship of the parties vis-a-vis both the lease and the option to purchase. Much of the four-page printed part of the Rome lease, even if not part of the expressed proposed deal, is certainly not surprising — like the provisions for default, insurance, a security deposit, perhaps even the one requiring a last month’s rent. “None of those provisions, and others not mentioned, “could be regarded as astonishing or grasping on the part of the proposed (lessor/ seller).” Blomendale, supra at 146. Even the provision for a personal guaranty, since not raised in plaintiffs bare-boned letter of offer, might have qualified as neither “astonishing nor grasping.”
But the Rome lease imposes burdens on plaintiff not only far beyond whatever the term “triple net lease” could possibly have meant, but seeks to change the basic terms of plaintiff s offer. As noted, for example, it seeks mid-stream, after April, 1989, to have plaintiff pay an extra $2,650 each month, the SBA cost, and during the lease term to have plaintiff pay a cost-of-living escalator. These additional lessee burdens flatly contradict the letter offer. While they and the other changes or additions in the Rome lease are sugar-coated in the covering letter (“If I have not stated the terms correctly, please advise”), the Rome lease proposal might well have been deemed a rejection of plaintiffs offer, Peretz v. Watson, 3 Mass. App. Ct. 727, 728 (1975) (“A purported acceptance which varies from the terms of the offer in any material respect is in effect a rejection”), or at best a conditional acceptance which plaintiff was free to reject. Lawrences. Rosenberg, 238 Mass. 138, 141 (1921). See analogous provision in Uniform Commercial Code, G.L.c. 106, §2-207.
Again,however,weneedn’tdecidethatquestion,forweleammorefromdefendant’s later action. Obviously, an active response from plaintiff would have been the more business-like way to bring the matter to a head. But time was passing for both sides. The space remained unoccupied and no rent was being paid. Whatever else may have been happening at the time neither the trial court nor we know. Again, however, the burden in its counterclaim is on defendant.
Perhaps realizing the effect of his proposed lease form, defendant’s attorney’s further communications attempt a strategic retreat. Acting as if the Rome lease had never existed, on November 19, 1987, defendant’s attorney again writes to plaintiffs Scottfeigning ignorance at “your failure to comply with “the lease agreement that von executed on September 10, 1987” (emphasis added). In December, in response to plaintiffs silence, a third letter threatens suit and gives plaintiff a week to respond, otherwise “I will conclude that you have no intention of honoring vour obligation as set forth in detail in vour letter of September 10, 1987. and will proceed accordingly” (emphasis added).
Thus, in defendant’s own words, there had been no claim of alease until defendants s counsel submitted the Rome lease in October, 1987, designating it as “the lease.” The metamorphoses followed. November brought with it the obligation to pay Chelsea the real estate taxes on the property. When the Rome lease was ignored,[1] defendant’s *22 attorney in November, 1987, re-named plaintiffs letter offer as “the lease agreement.” In December, 1987, it was transformed into “your obligations as set forth in detail in your letter of September 10, 1987.”
When plaintiff failed to respond within the prescribed one week, defendant was, of course, free to ignore its own threat to file suit. Perhaps that threat served to provoke plaintiff finally to consult an attorney, which led to his January, 1988, letter and the plaintiffs subsequentfiling of this suit. Perhaps, too, suitwas threatened in defendanfs attorney’s December, 1987, letter only to discourage or as a potential counter to an expected plaintiff claim for a refund of its original $7,500 payment. We are not told and do not know.
We consider defendanfs action, inaction and words, not as a measure of or to encourage for the purpose of reward or punishment aggressive or litigious behavior, but solely as a way of determining defendanfs perspective at the time of and after plaintiffs letter of offer and defendanfs apparent acceptance in depositing the check. In the circumstances of this case we conclude that it could not have been the “intention of the parties” to become and remain bound to and by the letter of offer since, based on what defendant himself did and said, he hasn’t even established that it was hi§ intention to be so bound. See and compare Blomendale v. Imbrescia, 25 Mass. App. Ct. 144 (1987), and Levenson v. L.M.I. Realty Corp., 31 Mass. App. Ct. 130 (1991). While no cases are exactly alike, what Blomendale determines in the case of a would-be purchase and sale of property where the parties are thereafter to go separate ways, applies a fortiori where, as prospective landlord and tenant, these parties had expected to become engaged. And while, unlike in Blomendale, there was no express expectation here of a signed agreement to follow, we do not find that omission fatal. As is said in Goren v. Royal Investments, Inc., 25 Mass. App. Ct. at 142, ‘There is commercial utility to allowing persons to hug before they marry.” We believe there is equally good reason, especially when the parties are planning to live together as landlord and tenant, to take note that not every accepted proposal ends up in marriage.
For the reasons stated, with respect to plaintiffs claim, Report Dismissed. With respect to defendanfs counterclaim, Report Allowed, judgment to enter for plaintiff.

 We note the stock market “crash” of October 19, 1987, but the record is silent on what effect, if any, that may have had.