AGNES L. CONNERY *vs.* NATHAN D. CASS.

Worcester.   September 22, 1931. — December 28, 1931.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Landlord and Tenant,* Existence of relation, Repairs.   *Agency,* Existence
of relation, Scope of authority.   *Evidence,* Competency.   *Damages,*
In tort.   *Practice, Civil,* Exceptions.

One, who so dealt with a building, title to which stood in the name of
his wife, that it fairly could be said that he assumed the duties and
responsibilities of a landlord with reference thereto, properly could
have been found, with relation to a tenant in the building, to be in

fact the landlord even if he did not represent in words to the tenant that he was the landlord.

On evidence, at the trial of an action by a tenant against the husband of the owner of the building in the circumstances above described, that the building was in charge of an agent through whom "everything was done" and who was the only person seen by the tenant in connection with the property; that reports about the property and repairs made thereon by the agent came to the husband, who said, with reference to repairs, that the agent "handled all that proposition. I wasn't looking after roofs," a finding was warranted that the agent had authority to make on behalf of the husband an agreement with the tenant to make repairs.

At the trial of an action of tort above described, there was evidence that the tenancy was oral; that the defendant's agent, at the time of the letting, agreed with the plaintiff to make repairs; that, upon the attention of the agent being called to leaks in the roof on two occasions shortly after the letting, he sent some one to repair the roof; that the leaks continued to appear at various times until the plaintiff left the premises about two years after the letting; that the roof was old and a new roof should have been installed; that the plaintiff conducted a rooming house business in the building; that the plaintiff's guests, many of whom "were more or less regular" patrons, left because of water coming into their rooms; and that the plaintiff's income from lodgers was substantially less the second year of the tenancy than it was the first year. The plaintiff sought to recover for loss of profits by reason of negligence of the defendant in making repairs. *Held,* that

(1) If the defendant, through his agent, promised to make repairs to the roof, undertook to make them and was negligent in making them, he was liable to the plaintiff for damages sustained by the plaintiff thereby;

(2) The evidence warranted an inference that the repairs were made negligently, and warranted a verdict for the plaintiff;

(3) An inference was warranted that the reduction in income suffered by the plaintiff resulted in large part from the leaks in the roof;

(4) In computing damages, the jury could consider loss of profits reasonably to have been expected by the plaintiff;

(5) The evidence did not leave such profits a matter of speculation;

(6) Evidence of conversations of a representative of the plaintiff with the defendant's agent and, after the death of the agent, with his successor properly was admitted;

(7) Evidence of conversations between the agent and one who made the repairs was admissible;

(8) Although testimony by the one who made the repairs, that the agent told him that the defendant had said that it "would cost more to put a new roof on than we were getting out of it," was hearsay and inadmissible, its admission in the circumstances did not appear to be error prejudicial to the defendant.

CONTRACT OR TORT. Writ dated August 2, 1928.

The original declaration contained only a count in contract, but subsequently the plaintiff amended by adding counts based upon negligence of the defendant in making repairs, and waived the original count. The action was tried in the Superior Court before *Beaudreau,* J. Material evidence is stated in the opinion. The judge denied a motion by the defendant that a verdict be ordered in his favor. There was a verdict for the plaintiff in the sum of $5,200, of which $4,300 was for loss of profits and $900 for damage to furniture and fixtures. The plaintiff subsequently remitted $900 by order of the judge. The defendant alleged exceptions.

*W. M. Quade,* for the defendant.

*G. E. O'Toole,* for the plaintiff.

CARROLL, J. This action of tort is against the alleged landlord of the plaintiff for the loss of business and profits of a rooming house, damaged, it is contended, by a leaking roof. There was evidence that in April, 1926, the plaintiff bought a rooming house business in Athol, known as the Bates house, and in May entered into occupation of the three upper floors of the building. The title to the real estate was and still is in the name of Mrs. Grace Cass, the wife of the defendant. The arrangements for the leasing of the premises were conducted by the plaintiff and her daughter with George Lord who, it was argued, was the authorized agent of the defendant. It does not appear that any written lease was executed. The plaintiff's daughter testified that when the premises were rented Lord was asked if he would make repairs and he replied, "Anything within reason." The first leak in the roof occurred late in May or early in June, 1926; Lord's attention was brought to this and he sent a man to repair it. Two months later another leak appeared; Lord was told of this and "he sent someone to fix it." In the spring of 1927 there were several leaks in the roof and the plaster fell; the leaks continued at various times until the plaintiff left the premises on July 15, 1928. George Lord died in February, 1928. After his death the plaintiff com-

plained to Fred Lord, and he "came over and looked at the place" and brought with him a man who made repairs at that time.

The defendant, called by the plaintiff, testified that "George Lord was looking after things for him at that time"; that George Lord was in charge of the property; that he thought George Lord had repairs made on the roof, "Mr. Lord handled all that proposition. I wasn't looking after roofs"; that he had talked with Lord about the condition of the roof; that the rent was paid to Lord and would "Go to the Cass family"; that the checks for the rent were made to "N. D. Cass," the defendant; that the arrangement for the amount to be paid Lord for his services was made with the defendant. Although the defendant testified that Lord's authority was limited to the collection of rents, he admitted that "everything was done through Lord," who was the only person seen by the tenants in connection with the property. He further testified that if anything was to be done to the property the tenants informed Lord; that reports about the real estate and what had been done by Lord came to his office; that he knew Lord had paid for repairs and Lord's accounts with reference to the tenement in question were made to the defendant's office; that the money received from Lord went into the bank account of the defendant; that he paid the taxes; and that Mrs. Cass had no "dealings" with Lord personally. There was also testimony that materials used in repairing the Bates house were charged to him. The defendant was asked if he "acted towards that property [the Bates house] just like any property that stood in . . . [his] own name"; he answered, "Yes." He also testified that he thought Lord made repairs on the roof, and after the defendant returned from Florida he talked with Lord about the condition of the roof; that he was informed of the condition of the roof of the Bates house; that he knew the roof "was in bad shape . . . . They had made temporary repairs."

There was evidence for the jury that on the death of George Lord the Lord firm continued to have charge of the property; that Will Lord was a member of the firm and Fred Lord was also a member or employee of the firm.

There was also evidence that the defendant assumed the duties of landlord of the Bates house, that he acted as one who was the owner of the estate, and the jury could have found that, although the real estate belonged to the defendant's wife, he was the landlord. *Lindsey* v. *Leighton*, 150 Mass. 285. In that case, at pages 287–288, it was said: "One may be a landlord who is not the owner. The tenant cannot escape from his obligations by showing that his landlord had no legal title; nor can the landlord escape from his obligations by showing the same thing." The obligations of landlord and tenant "depend upon the existence of that relation, and not upon the validity of the landlord's title." *Crowe* v. *Bixby*, 237 Mass. 249, followed *Lindsey* v. *Leighton*, 150 Mass. 285. In each of these cases the tenant dealt with the defendant. In the case at bar it does not appear that the defendant personally represented to the plaintiff that he was the landlord, but this fact is not sufficient to distinguish the cases. *Lindsey* v. *Leighton* and *Crowe* v. *Bixby* do not rest on the doctrine of the estoppel of the defendant by reason of his representations to the tenant. The liability of the defendant rests on the existence of the relation of landlord and tenant and of an agreement to repair, and whether that relation did or did not exist was a question of fact on all the evidence. If the defendant by his conduct in dealing with the property, by his knowledge and his transactions in reference to the property, so acted that it could be fairly said he assumed the duties and responsibilities of a landlord, it could be found he was in fact the landlord, although he made no such representation in words to the plaintiff.

It may be said that the defendant's acts were consistent with the contention that he was merely the agent of the owner, that all his conduct in reference to the Bates house showed that he was acting as her agent. But this question was for the jury to decide. They could have found that he assumed to be the landlord.

There was evidence that George Lord and the members of the Lord firm were the agents of the defendant, not

only to collect the rents, but to manage the property and to make repairs. George Lord, it could be found, agreed with the plaintiff to make repairs "within reason." The defendant admitted that George Lord was in charge of the property; that "everything was done through Lord"; that reports were sent to the defendant that temporary repairs had been made; and referring to repairs on the roof he said, "Lord handled all that proposition." A jury could find on all the evidence that George Lord had authority to make repairs, had agreed to do this, and that he made repairs with the approval of the defendant.

The third count of the declaration is based on the promise to make repairs. A landlord who promises to make repairs and undertakes to make them and is negligent in doing the work is liable to the tenant for the damages sustained thereby. *Shute* v. *Bills*, 191 Mass. 433. *McLeod* v. *Rawson*, 215 Mass. 257, 259. *Bergeron* v. *Forest*, 233 Mass. 392. The defendant by his agent made repairs when notified by the plaintiff that the roof was leaking, and the jury could find they were negligently made. It was open to the jury to find that the roof was in such a condition that extensive repairs were necessary and that the repairs made were not adequate. There was evidence that the roof was "old tin, and you could patch up one place, start walking and break through somewhere else"; that a new roof should have been installed; that on one occasion Lord said to the defendant, in effect, that he did not know what would happen unless something was done very quickly. The defendant admitted that Lord talked to him about a new roof. There was evidence from a witness who had repaired the roof in 1926, 1927 and 1928, that he "took some tar paper and some roofing cement and he also tried to drive some nails to hold the paper down but the nails were so short, only about an inch long and some of them you could pull out with your fingers." We are of opinion that there was evidence for the jury from which it might be found that the defendant was negligent in making the repairs.

The plaintiff's daughter, who managed the business,

testified that the income during the first year was $80 a week and the expenses $55 to $60 a week; that during the second year the income was reduced to $50 a week. The jury could infer from all the evidence that this reduction resulted in large part from the leaking roof. She further testified that in 1928 the income was still further reduced; that the guests left because of water coming into their rooms; that a number of the roomers "were more or less regular" patrons; that in the spring of 1928 the rain came through the roof to such an extent that "it came in on the people who were in bed, during the night"; that the plaintiff quit the premises in July, 1928.

It is contended by the defendant that the profits of the business were problematical; that there was uncertainty in estimating them; that they were too speculative; that there was no proof that the income of 1926 would continue even if there were no leaks. *Lowrie* v. *Castle*, 225 Mass. 37, 52.

Damages depending on estimated receipts and expenditures and profits reasonably to have been expected may be considered. *Nelson Theatre Co.* v. *Nelson*, 216 Mass. 30, 35, and cases cited. In *Pye* v. *Faxon*, 156 Mass. 471, the plaintiff was a tenant at will of a house used as a lodging house. There was a verdict for the plaintiff which was upheld. It was said in that case at page 475: ". . . if the plaintiff had a cause of action against the defendant, she was entitled to compensation for the diminution in her business and profits occasioned by acts for which he was responsible, and evidence of loss of rent was admissible." See also *French* v. *Connecticut River Lumber Co.* 145 Mass. 261, 265, where the proprietor of a hotel on the summit of Mt. Holyoke was allowed to recover damages resulting from the defendant's obstructing the Connecticut River at the plaintiff's landing. The loss in receipts and profits from visitors to the hotel was held to be competent evidence upon the question of the loss occasioned to the plaintiff. We are of opinion that the plaintiff was entitled to recover damages for the loss of rentals from her rooming house. *Neal* v. *Jefferson*, 212 Mass. 517. *Narragansett Amusement Co.* v. *Riverside Park Amusement Co.* 260 Mass. 265.

The defendant excepted to the admission of testimony of a conversation between George Lord and the plaintiff's daughter, which took place when the house was rented. It tended to show what the contract was. As Lord had authority to do what he did, the evidence was admissible. The subsequent conversation between the same parties when complaint was made about the leaks was admitted properly.

Testimony of a conversation between the plaintiff's daughter and Fred Lord was also admitted. There was no error in this. Fred Lord was associated with George Lord and it was a reasonable inference from all the evidence that Fred succeeded George in the management of the property.

The testimony that George Lord told the repair man to obtain what materials he needed from a certain hardware store and have them charged to N. D. Cass was admissible, as was the testimony of the conversations between the witness Isrow and George Lord.

Isrow was allowed to testify that he had a talk with George Lord about putting on a new roof in which Lord said that the defendant had said that it "would cost more to put a new roof on than we were getting out of it." This evidence was not admissible: it was the statement of Lord of what the defendant told him; it was hearsay. The defendant admitted that he knew the roof was leaking and talked with Lord about its condition and discussed the advisability of adding a new roof. Even if the evidence might be harmful, under *Commonwealth* v. *Dascalakis*, 243 Mass. 519, and *Commonwealth* v. *McDermott*, 255 Mass. 575, we are unable to believe that the result would be affected by the exclusion of the testimony. As the case has been fully tried, the error does not require that the exceptions be sustained. *First National Bank of Haverhill* v. *Harrison*, 271 Mass. 258, is not in conflict.

We have examined the remaining exceptions of the defendant. We think they are without merit. The denial of the defendant's motion for a directed verdict was right.

*Exceptions overruled.*