Doerfer, J.
Introduction
In this matter Foxboro Realty Associates (FRA) seeks possession of a portion of a certain 330 acre parcel of land in Foxboro, Massachusetts adjacent to Foxboro Stadium. The disputed portion is a harness raceway currently occupied and operated by Foxboro Park, Inc. (FP), an entity controlled by Mr. Charles Sarkis and his family (Sarkis), Sarkis business interests have been concentrated both in restaurants and in operating racetracks. FRA is an entity controlled by Mr. Robert Kraft and his family (Kraft) which also owns the New England Patriots. Kraft is engaged in a wide variety of other businesses. FP claims it is entitled to remain on the property under what it claims is a valid written long term lease executed between itself and an entity known as Foxboro Route 1 Limited Partnership, (FR1), an entity in which Mr. Kraft is a fifty-percent owner, the other fifty percent being owned by Mr. Robert Karp, a real estate owner, developer and operator.
FP also asserts fraud and related claims against Mr. Kraft and others.
After considering motions for summary judgment, and as the result of various pre-trial conferences held in this matter the court, on April 11, 1997 ordered pursuant to Mass.R.Civ.P. 42(b) that a separate trial on certain issues would be convenient and conducive to expedition and economy. That trial was begun on April 16, 1997 and the evidence was concluded on April 18, 1997. Final argument was heard on April 22, 1997.
The issues were tried to the court without a jury, based on the court’s order of April 10, 1997. Pursuant *343 to Mass.R.Civ. P 52(a) the court issues this memorandum of decision in which appear the court’s findings of fact and conclusions of law.
Many of the relevant facts in this dispute are based on written documents the authenticity of which are not in dispute. A substantial portion of the testimony of witnesses was offered and received largely to supply relevant context in which the documents were created, and to assist the court in understanding the relevant portions of the documents. Where there were conflicts in the testimony the court has resolved those conflicts based upon the usual considerations relating to the assessment of the credibility of the witnesses. The court has drawn reasonable inferences from all the credible evidence.
Prior Proceedings and Background Facts
By agreement of the parties, and upon an Order issued by the court pursuant to that agreement on April 7, 1997, FP claims a right to possession of the premises based solely on a sublease which was appended to a June 17, 1991 Escrow Letter Agreement, except that they also claim (1) that rent and related occupancy charges from 1992 to 1996 was deferred; (2) that the number of running dates that FP was required to conduct on the premises was reduced; (3) that the form of the sublease reflects a meeting of the minds of the parties on all essential and material terms of a long term sublease and that failure to come to agreement on any terms not set forth in the lease did not render it unenforceable; and (4) that one or more conditions contained in the escrow letter agreement were waived.
The parties to the sublease which was put in escrow were Foxboro Route 1 Limited Partnership (FR1) as lessor and FP as lessee. At the time the lease was signed and put into escrow the owner of the properly was Foxboro Associates (FA), an entity controlled by Edward Andelman. FA was unable to enter into a prime lease of the property with FR1 without the assent of the holder of a second mortgage on the property (the Lowe mortgage). Consequently FA and FR1 went to elaborate lengths to prevent their relationship from becoming one in which the Lowe mortgage would accelerate. They entered into a five-year option agreement in 1990 giving FR1 an option to enter into a prime lease during the five-year option period. The option agreement also gave FR1 the right to operate the premises, and required FR1 to make monthly option payments.
In 1995 the option agreement expired. FR1 entered into a purchase and sale contract with FA which was due to close on January 10, 1996. The transaction did not close. A new transaction was negotiated in which the property was sold to the plaintiff herein, FRA, on May 1996. FRA seeks to evict FP.
As noted above, FP claims to be entitled to remain on the property pursuant to the sublease between FP and FR1. They intend to produce evidence that the terms under which the sublease was being held in escrow were waived and that the sublease reflected a meeting of the minds on all terms which the parties regarded as essential. The trial of those issues would involve extensive testimony, much of which, they claim would overlap their fraud claim which must be determined by a jury. But the court suggested that there is an issue which must be addressed even if FP is successful in showing that the terms of the escrow were waived and that the lease is sufficient and not an uncompleted negotiation: FR1 did not exercise its option to lease from FA and never became a tenant under a prime lease with FA. Furthermore, FR1 never took title to the property. How then, even if a sufficient sublease came out of escrow, could it have created a leasehold interest sufficient to protect FP from eviction?
The court determined that this issue was sufficiently important and limited that it should be tried first, before any trial of the broader claims that the terms of the escrow were waived and that the lease is sufficient and not an uncompleted negotiation. The court’s attention was initially directed by FP to the doctrine of estoppel: FP argues that even though FR1 didn’t have a leasehold or a title to the property when it entered into a lease with FP, the facts and circumstance require that FRA (as the alleged successor to FR1) be estopped from asserting the infirmities of FRl’s status at the time of the alleged creation of the lease. Subsequently FP’s argument was broadened by noting that, through serendipity or otherwise FRA is now the title holder and in a position to specifically perform the alleged obligations of FR1 under the lease. FP emphasizes the contractual nature of the lease and argues that it is of no importance that a property interest in the form of a leasehold estate was never created.
FRA argues that the defect in the capacity of FR1 to create a leasehold estate is fatal to the claims of FP that it is entitled to remain under the lease. FRA also argues that whatever contractual obligations FR1 had to FP, FR1 is not in a position to perform them since it does not own the property and that FRA is not bound by any supposed contractual obligations of FR1 to FA.
The factual context in which these issues arose was regarded by the court as sufficiently complex and the issues sufficiently important to deserve separate and individual attention before launching into a protracted trial on the other issues in the case. For if FR1 lacked either a prime lease or title at the relevant points in time, the court should determine whether FRA is burdened by the obligations of the escrowed sublease on these grounds alone, even if FP proves that the terms under which the sublease was being held in escrow were waived and that the sublease reflected a meeting of the minds on all terms which the parties regarded as essential.
*344 Thus the court proceeded to hear evidence in order to determine whether, even if FP proves that the terms under which the sublease was being held in escrow were waived and that the sublease reflected a meeting of the minds on all terms which the parties regarded as essential, FRA is relieved of any burden of the sublease for either of two reasons: 1) if it stands in the shoes ofFRl, that no principles of estoppel or contract operate to ensnare it into the obligations of the sublease: and 2) FRA does not have the same obligations to FP as would FR1 if FR1 had taken title rather than FRA.[1]
Another issue was initially prominent in the decision to separate out these issues for trial: Did FR1 and FA in fact have a lease at any time? As will be seen below, this issue was resolved in the negative without much debate.
Relevant Subsidiary Facts
I.Description of the Property and its Uses
Foxboro Stadium in Foxboro, Massachusetts sits on land owned by the Town of Foxboro. It is the home of the New England Patriots football team. It also is the site of other events such as concerts and soccer games. Large numbers of people are attracted to these events, along with their automobiles.
The events at the Stadium are episodic, not continuous or daily.
Adjacent to the Stadium is a horse raceway which was in operation long before the Stadium was built. Harness racing was held at Foxboro raceway for decades until the mid 1980’s when interest in the sport diminished.
Various portions of the land adjacent to Foxboro Stadium is used by the stadium for parking, under various arrangements with the owners of the land since Foxboro stadium was built.
II.The Persons and Entities and their Relation to the Properly
The owner of the land adjacent to the Stadium, including the raceway and parking areas was, at all material times until 1996, Foxboro Associates, a limited partnership, controlled by Edward Andelman. The land was comprised of about 330 acres, bordering on Route 1, and includes various improvements as well as vacant land not used for the raceway or for parking.
Foxboro Stadium was originally owned by an entity controlled by the Sullivan family which leased it to the Patriots, in which the Sullivans also had an ownership interest. The Sullivan interests leased parking from Foxboro Associates.
Robert Kraft took an interest in the mid 1980’s in acquiring the Patriots, which was up for sale. He did not succeed in acquiring the Patriots at that time. After doing some due diligence and learning more about the stadium and the parking situation as well as other economic opportunities relating to the property, he joined forces with Stephen Karp, a real estate operator and mall developer. In 1986 Kraft and Karp acquired an option to purchase the equity in Foxboro Associates. They agreed to advance approximately $2 Million to Foxboro Associates by paying various expenses of Foxboro Associates as they became due. The option expired in 1989 without being exercised. This option gave them effective control, between 1986 and 1989, over the land adjacent to Foxboro stadium, including the parking areas and the raceway.
The entity which owned the Stadium was in bankruptcy in or around 1986. Kraft and Karp formed a corporation, K Corp., which successfully bid for the stadium in Bankruptcy Court. The rights of K. Corp. were assigned to a limited partnership formed by Kraft and Karp known as Foxboro Stadium Associates Limited Partnership (FSA). Title to the stadium was taken by FSA in 1989.
III.The Situation in 1990[2]
In 1990 the option to acquire the equity of Foxboro Associates had not been exercised. Kraft and Karp discussed with Foxboro Associates the possibility of entering into a lease of the Property. Initially, they discussed a lease for a period of time which would be coterminous with the then existing lease of the stadium to the New England Patriots, which was due to run through the year 2002.
Messrs. Karp and Kraft formed Foxboro Route 1 Limited Partnership (“FR1”), with two equal general partners, Kraft Route 1, Inc. and Karp Route 1, Inc., which were controlled, respectively, by Mr. Kraft and Mr. Karp.
Despite these discussions, FR1 and Foxboro Associates never entered into the lease they were discussing. Foxboro Associates’ second mortgagee, the Estate of E.M. Loew, held the right under its mortgage (the “E.M. Loew Mortgage”) to accelerate the mortgage if Foxboro Associates leased the Property. E.M. Loew would not consent to continue the mortgage in effect upon a potential lease of the Property to FR1 without a significant payment from Foxboro Associates. Foxboro Associates decided it did not want to pay off the E.M. Loew mortgage at that time and that it did not want to pay the Estate of E.M. Loew the amounts, it wanted in order not to accelerate the mortgage in the face of a lease to FR1.
This financial decision by Foxboro Associates then led FR1 and Foxboro Associates to discuss alternative arrangements with respect to the Property, and on October 19, 1990, they entered into an operating agreement with an option to enter into a lease (the “1990 Option Agreement”).[3] See Trial Ex. 4.
IV.The 1990 Events and Documents
Paragraph A of the 1990 Option Agreement recites that Foxboro Associates and FR1 had negotiated a lease (the “Prime Lease”) attached as Exhibit A to the 1990 Option Agreement, but that said lease was “null and void ab initio."
*345 The 1990 Option Agreement granted to FR1 by Foxboro Associates an option to lease the Property through 2002 and the right to operate the Property, and called for monthly option payments of $100,000. The option and operating agreement had a maximum term of five years, but FR1 could end the option and operating agreement earlier by giving notice. (13(b) of Trial Ex. 4.)
At no time did FR1 exercise the option provided by the 1990 Option Agreement. At no time did FR1 lease or own the Property.
Foxboro Associates and FR1 clearly intended that the 1990 Option Agreement not constitute a lease or other interest in Property comparable to a lease and not grant FR1 any rights other than as an option having certain specified operating rights (e.g., Trial Ex. 4, ¶14).
On October 19, 1990, FR1 also entered into a second option letter agreement with defendant Foxboro Park. As set forth in its opening paragraph (Exhibit 6 at ¶B), that option agreement (the “1990 Sublease Option Agreement”) states that the agreement was intended to provide Foxboro Park “with an option to sublease certain parts of the [Property] from [FR1].” The option under the 1990 Sublease Option Agreement was never exercised. It was replaced by a 1991 Escrow letter with attached sublease, the document under which FP claims to be entitled possession.
V. The Situation in 1991[4]
On June 17, 1991, FR1 and Foxboro Park entered into an Escrow Letter Agreement with a form of sublease appended thereto that explicitly, “substituí[ed] for the Sublease Option Agreement” and rendered the 1990 Sublease Option Agreement “of no further force and effect.” Trial Ex. 7 (June 17, 1991 Escrow Letter Agreement) ¶¶C and 5.
The June 17, 1991 Escrow Letter Agreement
This document was in the form of a letter agreement, addressed to Foxboro Park, Inc., signed by Foxboro Route 1 Limited Partnership, and countersigned by Foxboro Park, Inc. It begins with three paragraphs, preceded with the phrase, “Reference is made to the following facts which constitute the background to this letter agreement.”
The first reference (paragraph A), is to the October 19, 1990 option to lease agreement between Foxboro Associates and Foxboro Route 1 Limited Partnership “under which . . . [Foxboro Route 1 Limited Partnership] is given an option to enter into a lease (the “Prime Lease”) of certain premises owned by . . . [Foxboro Associates] in Foxboro Massachusetts. These premises are more particularly described in said option agreement (the “Option Agreement”) and herein as the ’’Premises."
The next reference is to the October 19, 1990 sublease option agreement[5] between Foxboro Route 1 Limited Partnership and FP providing FP with an option to lease certain portions of the premises (Trial Exhibit 6).
The final reference recites that the sublease option agreement contemplated that FR1 and FP would forthwith complete the text and exhibits of the sublease annexed to the sublease option agreement as Exhibit A thereto, and that Foxboro Route 1 Limited Partnership and FP “have now completed the text and exhibit of the Sublease and agreed to certain other changes therein and intend by this agreement to provide for the execution of the Sublease, in escrow, with terms and conditions of this escrow agreement now substituting for the Sublease Option Agreement.
The June 17, 1991 Escrow Letter Agreement then recites good and valuable consideration and sets forth in 13 numbered paragraphs the agreement of the parties.
Paragraph 1 states that, “[s]ubject to the escrow terms and conditions hereof, the parties "have agreed to execute the completed Sublease attached hereto as Exhibit A and to deposit the Sublease with the Escrow Agent as herein defined."
It should be noted at this point, as recited above, by agreement of the parties, and upon an Order issued by the court pursuant to that agreement on April 7, 1997, FP claims a right to possession of the premises based solely on the sublease which was appended to this June 17, 1991 Escrow Letter Agreement, except that they also claim (1) that rent and related occupancy charges from 1992 to 1996 was deferred; (2) that the number of running dates that FP was required to conduct on the premises was reduced; (3) that the form of the sublease reflects a meeting of the minds of the parties on all essential and material terms of a long term sublease and that failure to come to agreement on any terms not set forth in the lease did not render it unenforceable; and (4) that one or more conditions contained in the escrow letter agreement were waived. The court has preserved the right of FP to litigate these issues if this phase of the trial does not dispose of the possession issues. The focus of this phase of the trial is whether any rights to present occupancy of the premises were created by this sublease, in view of the facts that 1) Foxboro Route 1 Limited Partnership never entered into a Prime Lease with Foxboro Associates and 2) Foxboro Route 1 Limited Partnership never took title to the property.
Paragraph 2 of the June 17, 1991 Escrow Letter Agreement states, in substance, that if the “Conditions” (as defined in Section 3 of the agreement) are timely satisfied Foxboro Route 1 Limited Partnership is required to exercise its option to enter into the Prime lease with Foxboro Associates. Provided that, as a result of exercising the option, the Prime Lease actually comes into existence, the sublease is to be delivered out of escrow. Thus there was an explicit recognition in the June 17, 1991 Escrow Letter Agreement that the escrowed sublease would come out of *346 escrow if the escrow conditions were met (or waived) but provided[6] that no sublease would be in existence unless a Prime lease existed. Indeed, it was not sufficient that Foxboro Route 1 Limited Partnership give notice and attempt to exercise its option to obtain a prime lease; it had to be successful in getting a prime lease before the sublease could come into existence.
As of June 17, 1991, Foxboro Associates continued to have exclusive ownership of the Property. The only agreement in place between FR1 and Foxboro Associates with respect to the Property on June 17, 1991 was the 1990 Option Agreement. As set forth above, the 1990 Option Agreement conveyed to FR1 merely (i) an option to lease the Property; and (ii) the contractual right to “operate the Premises.” Trial Ex. 4 ¶¶B(1) and 4(c).
In consideration for the option to lease and the right to operate the premises, FR1 had paid Foxboro Associates $500,000 as an “Initial Option Payment” and $100,000 per month in “Monthly Option Payments.” 1990 Option Agreement (Trial Ex. 4) ¶¶3(a) and (b). As of the execution of the Escrow Letter Agreement on June 17, 1991, FR1 had not exercised the option to lease contained in the 1990 Option Agreement.
FR1 and Foxboro Associates intended that the 1990 Option Agreement not convey to FR1 a leasehold interest in the Property. Foxboro Park had knowledge of these facts when it signed the Escrow Letter Agreement and appended Form of Sublease.
The intent of FR1 and Foxboro Associates that the rights granted to FR1 under the 1990 Option Agreement not be a leasehold interest was explicitly set forth in the agreement itself. Paragraph 14 of the 1990 Option Agreement provides:
The parties hereto expressly state that this agreement is not intended in any way to establish a relationship in the nature of a landlord-tenant or a partnership between the parties hereto prior to a closing, if any, by Optionee hereunder, but rather is intended solely to establish an optionor-optionee relationship with the optionee having certain operating rights as herein set forth. (Emphasis added.)
Foxboro Park possessed actual knowledge that FR1 lacked the capacity to grant a lease. At all relevant times, Foxboro Park knew that FR1 had only an option to lease, and not a lease, of the Property. In the 1990 Sublease Option (Ex. 6, ¶A), Foxboro Park specifically acknowledged the existence of the 1990 Option Agreement and, further agreed that the sole relationship established by the Sublease Option was that of “op-tionor-optionee.” (Ex. 6, ¶12.) Similarly, the opening paragraph of the June 17, 1991 Escrow Letter Agreement explicitly notes that the Property at issue is the subject of an “option to lease” given to FR1 by Foxboro Associates. Ex. 7, ¶A. Further, the second section of the escrowed form of sublease (the very first section therein after the description of the premises) is entitled “Relationship to Option to Lease Agreement . . .” and explicitly provides that the escrowed form of sublease is “intended to be subject to such Prime Lease upon the effectiveness of the Prime Lease." Id. Exhibit A §2, (emphasis added). Foxboro Park, therefore, had knowledge when it entered into both the Sublease Option Agreement and the Escrow Letter Agreement that FR1 had neither an ownership nor a leasehold interest in the Property but merely an option to lease.
VI. 1991-1995
Prime Lease Never Came Into Force After 1991
By its terms, the 1990 Option Agreement was to expire on October 19, 1995. From October 19, 1990 through October 19, 1995, FR1 operated the Property and made its Monthly Option Payments in accordance with the 1990 Option Agreement. FR1 never exercised the option to lease under the 1990 Option Agreement. FR1 never leased the Property from Foxboro Associates. At no time did FR1 make any payments to Foxboro Associates in accordance with Schedule C of the Prime Lease appended to the 1990 Option Agreement, which Schedule sets forth the graduated rental payments which would have been required had FR1 exercised its option to lease. See Trial Ex. 4, Schedule C.
At no time did FR1 send Foxboro Associates written notice of FRl’s intention to exercise its option under the 1990 Option Agreement which, pursuant to paragraph 4 thereof, was required for FR1 to exercise its option to lease.
Expiration of 1990 Option and Entry Into P&S in 1995
On October 18, 1995, FR1 and Foxboro Associates executed a Purchase and Sale Contract (the “1995 P&S”). Trial Ex. 11. The 1995 P&S was not an exercise of the option to lease, but by its very terms was a new agreement intended to moot that option.
By its terms, the 1995 P&S extended the expiration date of the operating aspects of the 1990 Option Agreement to January 10, 1996, the closing date contemplated by the October 1995 P&S. Trial Ex. 11, Articles 4 and 12(d). The 1995 P&S did not extend FRl’s right to exercise its option to lease. Subparagraph “a” of Article 12 of the 1995 P&S provides that “[s]o long as Foxboro Associates is not in material default of any of its obligations hereunder and [FR1] has not elected to terminate this Contract as a result of such default, [FR1] shall not exercise its option to lease [under the 1990 Option Agreement].”
At no time did Foxboro Associates default on any of its obligations under the 1995 P&S and, in all events, FR1 never exercised its option to lease. By operation of Article 12(a) of the 1995 P&S, therefore, after October 18, 1995, FR1 was barred from exercising its option to lease under the 1990 Option Agreement, as extended by Article 12(d) of the 1995 P&S.
Further subparagraph “b” of Article 12 of the 1995 P&S provides that "(if FR1] defaults materially in its *347 obligations under this Contract, in addition to the right of [Foxboro Associates] to terminate this contract and recover [$2 million in] liquidated damages . . . [FR1 ] shall be deemed to have waived its option to lease contained in the [1990 Option] Agreement."
FR1 did materially default on its obligation under the 1995 P&S in that it failed to close on January 10, 1996, as required by Article 4 thereof.
As of January 10, 1996, any and all remaining vestiges of the 1990 Option Agreement ended. See Article 12(d) of the 1995 P&S, to the effect that “the expiration date of the [1990 Option Agreement was to] be extended from October 19, 1995, to the later of (i) the Closing Date hereunder as the same may be extended or accelerated as provided herein, or (ii) the extension date if applicable set forth in clause (c) of this Article 12.” FR1 and Foxboro Associates never extended the Closing Date contemplated in the 1995 P&S. The Closing Date remained January 10, 1996, as provided in Article 4.
FR1 continued making its Monthly Option Payments only through January 10, 1996. As a result of FRl’s default of its obligation to close on January 10, 1996, Foxboro Associates issued a written notice of default to FR1 on that same day. Trial Ex. 12.
By operation of Article 12(e) of the 1995 P&S, FRl’s default terminated the 1990 Option Agreement. At no point prior to the termination of the 1990 Option Agreement did FR1 exercise its option to lease thereunder or otherwise acquire an interest in properly in its name sufficient to enable it to convey a sublease to Foxboro Park.
With the 1990 Option Agreement terminated effective January 10, 1996, FR1 thereafter was not a named party to any option to lease, operating agreement, or any other agreement extending it rights, or even potential future rights, with respect to the Property. FR1 made no Monthly Option Payments to Foxboro Associates after January 10, 1996.
There was some evidence that invoices were sent by Foxboro Stadium Associates after January 10, 1996 to FP relating to taxes and other charges associated with the property. There was also direct testimony that FR1 had no involvement in the Property and did not pay or incur any expenses in connection with the Property after January 10, 1996.
The evidence offered to contradict the direct testimony that FR1 had no involvement in the Property and did not pay or incur any expenses in connection with the Property after January 10, 1996 was inconclusive, unpersuasive and speculative and I do not find it persuasive. I do not find that FR1 had a continuing presence on the premises after it defaulted on January 10, 1996. The weight of the evidence is to the contrary, that Kraft and Karp had parted company on the Foxboro venture and that Kraft maintained his interest in the property as his own affair and without any use of FR1, an entity controlled jointly by Kraft and Karp.
Although FR1 did not close on the 1995 P&S on January 10, 1996, and has had no further involvement with the Property, it remains in existence with Kraft Route 1, Inc. and Karp Route 1, Inc. as its two general partners.
Foxboro Associates made no demand upon FR1 after January 10, 1996 for any option or other payments with respect to the Property and, as Foxboro Associates’ principal Edward Andelman testified at trial, Foxboro Associates was then a “free agent” which could sell or lease the Property to any party.
VI. The Purchase by FRA and the Relationship Between FRA and FR1
Foxboro Realty Associates purchased the Property from Foxboro Associates on May 28, 1996. In connection with its acquisition, Foxboro Realty Associates and Foxboro Associates negotiated and executed a Purchase and Sale Contract (the “1996 P&S”) Ex. 14.
Exhibit B to the 1996 P&S identifies certain encumbrances subject to which Foxboro Realty Associates agreed to purchase the Property. Most pertinent hereto, Exhibit B to the 1996 P&S provides in pertinent part that “[t]he Premises shall be conveyed subject to the rights, if any" of several “occupants” including not only “The Westwood Group, Inc. or other operator of the racetrack,” but also other “occupants,” including “Charles Trebino and other occupants of the so-called Trebino Property.” Trial Exhibit 14 at Exhibit B. None of these “occupants” is identified as having any rights, let alone any lease rights.
By qualifying the “rights” of the occupants subject to which Foxboro Realty Associates was purchasing the Property with the restrictive clause “if any,” Exhibit B to the 1996 P&S reflects that Foxboro Associates and Foxboro Really Associates did not intend to suggest that said occupants necessarily had any rights at all, and certainly did not intend to impose upon Foxboro Realty Associates an obligation to Foxboro Park in the nature of a thirty-five year lease. This is confirmed by the fact that, where there were lease encumbrances (i.e., the “Parking Lease”), Exhibit B to the 1996 P&S explicitly identified them as such.
In any event it was the position of counsel in this matter at trial that the claims of FP are not based on any claim that Foxboro Associates had either a direct lease with FP which was assumed by FRA or FR1 or even that FR1 had a prime lease with Foxboro Associates that was assumed by FRA. FP’s argument is that it had a “lease” in the sense of a contract with FR1 which FRA is now capable of performing as a “successor” to FR1.
Foxboro Realty Associates did not “step into FRl’s shoes” upon the termination of FRl’s rights under the 1990 Option Agreement on January 10, 1996. FRA was not a successor to FR1 in any legally relevant *348 sense and FR1 never assigned to FRA any of the rights it held under the 1990 Option Agreement, the Escrow Letter Agreement or the October 1995 P&S.
FP argued at trial and sought to elicit evidence that Foxboro Realty Associates simply exercised the failed 1995 P&S between FR1 and Foxboro Associates. As an initial observation, even if it did simply sign a deal that had been negotiated by FR1, it did not thereby become the assignee of FR1, subject to FRl’s obligations, if any, to FP.[7]
In any even the court is persuaded that there were significant differences in the deal between FA and FR1 and subsequently between FA and FRA. The negotiations between the Kraft organization and Foxboro Associates that occurred after January 10, 1996 were extensive, involving numerous drafts, meetings, and telephone conferences, and resulting in a significantly different agreement from the 1995 P&S. During the negotiations leading up to both the execution of the May, 1996 P&S, as well as to the failed closing on the October, 1995 P&S, Foxboro Associates took the negotiating position that the true fair market value of the Property was $21-22 million. Although ultimately compromising on this figure, Foxboro Associate’s principal, Mr. Andelman, testified that he never changed his opinion during either negotiation that that figure represented the Property’s fair market value.
. The agreements contain different amounts due at closing, different payment terms, different remedies for breaches, different provisions regarding environmental representations, and holdbacks, different handling of the Fleet mortgage discharge, and numerous other differences. These differences result in deals of differing financial value and risk as between the two sets of parties.
Foxboro Realty Associates never adopted or agreed to be bound by the Escrowed Sublease. There was no evidence that Foxboro Realty Associates explicitly undertook to be bound by the escrowed form of sublease. FP’s claims in this regard are that FRA is subject to some form of “successor liability” because of its knowledge of the documents and notice of all the relevant facts. At bottom FP seeks to hold FRA through the involvement of Mr. Robert Kraft who was involved in FR1. Even if it is inferred that Mr. Kraft was aware of all the facts upon which FP relies, the evidence is insufficient to persuade the court that there was a sufficient identity of interest between FRA and FR1 to impose upon FRA any liabilities of FR1, even assuming such liabilities exist. These were separate enterprises organized for separate purposes and involved different principals. There is no persuasive basis to infer that FR1 transferred its assets or liabilities to FRA.
Rulings of Law
One cannot convey an interest in real estate that one does not hold. Emery v. Crowley, 371 Mass. 489, 493 (1976) (“since the grantor conveyed to Tukis no interest in parcel 2 beyond the express rights of way above described, Tukis could pass none to Crowley”); Marshall v. Francis, 332 Mass. 282, 288 (1955) (one cannot convey that which he does not own).
An option to lease does not constitute a property right. See 14 Powell & Rohan, Powell on Real Property ch. 81, ¶879[2][b] (1997 ed.) (“[u]ntil the option is exercised and the resulting contract arises, the option does not give the prospective purchaser any right to the property itself other than the right to accept the seller’s offer to sell the property on the exact terms provided for in the option”) (emphasis added). Accord ML. Gordon Sash & Door Co. v. Mormann, 271 N.W.2d 436, 439 (Minn. 1946) (“As a general rule, an option to purchase real property, prior to its exercise, conveys no interest in the land”).
In contrast with a lease, a license conveys no interest in land, but merely excuses acts done by one on land in possession of another that without a license would be trespass. Baseball Pub. Co. v. Bruton, 302 Mass. 54, 55 (1938).
Whether a particular agreement is a lease or a mere license depends on the parties’ intent. The cases instruct that whether the parties intended to convey a right of exclusive possession to the property is revealed by the language of the agreement and the surrounding circumstances. Wunsch v. Donnelly, 302 Mass. 286, 289 (1939); In re Harbour House Operating Corp. 26 B.R. 324, 328 (Bankr. D. Mass. 1982); Restatement (Second) of Contracts (Landlord-Tenant) §1.2 cmt. a (1977); 51C C.J.S. Landlord & Tenant §202(6) at 524.
The language of the 1990 Option Agreement, 15(c), does not suggest that the parties intended to transfer possession of the Property. Furthermore, 15(c) (which grants the right to operate the Property) lacks the usual words of conveyance such as “grant," “lease,” “let,” or “demise.” See In re Harbour House, 26 B.R. at 328 (absence of usual words of conveyance was evidence that parties did not intend to transfer possession of the property).
The best reflection of the parties’ intent is, of course, their agreement. Here the parties expressly agreed that they did not intend the 1990 Option Agreement to create a “landlord-tenant relationship,” but merely to create an optionor-optionee relationship with the optionee having certain operating rights. Trial Ex. 4 ¶14. Moreover, the principals of FR1 agreed to potential personal liability if a court ever concluded the 1990 Option Agreement constituted a basis for the Estate of E.M. Loew to accelerate its second mortgage. Trial Ex. 4, ¶6(c).
The factual background and the language of the 1990 Option Agreement, which indicates that Foxboro Associates did not intend to transfer and FR1 did not intend to obtain, rights in the Property, as well as the credible testimony of the parties to the 1990 Option Agreement (as provided by Messrs. Karefitz, Wekstein and Andelman), establishes that the 1990 Option *349 Agreement did not grant FR1 a leasehold or other property interest.
Even if FRl’s mere right to operate the Property (which right expired by no later than January 10, 1996) could be construed as a five-year lease, FR1 could not grant any interest in the Property greater in duration than whatever interest it held. 1 Milton R. Friedman, Friedman on Leases §7.701 at 416 (4th ed. 1997) (“A prime tenant may not sublet more than he has”). Accord 51C C.J.S. Landlord & Tenant §48(1) at 140 (“In general, the rights of the subtenant are measured by those of his sublessor. A sublessee can in no event have any greater rights against the lessor than were given by the original lease to the lessee”). See also D.A. Schulte, Inc. v. Brockton YMCA, 273 Mass. 335, 342 (1930) (“[i]t is plain that any rights the plaintiff had under its sublease during the terms of the original lease terminated with the expiration of the original lease”); United States v. Marin, 651 F.2d 24, 30 (1st Cir. 1981) (“Having no rights in the property, [purported tenant] could convey none to [purported subtenant] , and the sublease between [them] was void as well”); Anheuser-Busch, Inc. v. Miller, 99 B.R. 137, 140-41 (D. Mass. 1989) (where tenant subleased stadium to subtenant before luxury boxes even existed, luxury boxes were not part of the demised premises, and landlord, rather than tenant, was entitled to revenues from luxury boxes).
Accordingly, as of June 17, 1991, FR1 did not hold any interest in the Property (as opposed to a mere contractual right to obtain such an interest) sufficient for it to convey to Foxboro Park the long-term sublease it relies upon for its claim of right to remain on the Property.
The escrowed form of sublease could not have sprung into effect after June 17, 1991 so as to bind FR1, if at all, absent FR1 at some point thereafter having obtained an interest in the Properly sufficient for it to have had the capacity to grant Foxboro Park the 35-year lease to which it claims a right via the escrowed form of sublease.
FR1, therefore, would have had to have either purchased the Property or secured a leasehold interest therein. FR1, however, never did either. Indeed, FRl’s 1995 P&S with Foxboro Associates, 1112(a), clearly provides that its execution did not constitute an exercise of FRl’s rights under the 1990 Option Agreement. 1995 P&S ¶12(a).
Because FR1 never exercised its option to lease, FR1 never gained a property interest in the Property and therefore could not convey a long-term leasehold interest to Foxboro Park.
Even if FRl’s mere contractual right to obtain an interest in the Property (the 1990 Option Agreement) is deemed to have granted an interest in the Properly, any such interest expired no later than January 10, 1996, when FR1 defaulted on the 1995 P&S. See 1995 P&S at ¶12(b). Thus, FR1 never obtained, and as of January 10, 1996 no longer even had a contractual right to obtain an interest in the Properly sufficient for it to convey a long-term leasehold interest in the Property to Foxboro Park. Accordingly, FR1 never obtained an interest in the Property that would have enabled it to convey to Foxboro Park a 35-year lease. The escrowed form of sublease, therefore, never sprang into effect to bind FR1.
Defendants’ Requests
The defendants argue that FR1 was in a position to enter into a Prime Lease for a longer period of time, 2002, than it was entitled to stay under the 1990 option (1995). They further argue that Foxboro Associates was aware that if the Prime Lease was entered and if the long term sublease with FP was entered, Foxboro Associates would be bound for a longer period with FP than it was with FR1. This argument merely supports the conclusion that, if the prime lease was entered and approval was given by Foxboro Associates to the long term sublease, including the waiver of numerous conditions of the escrow, Foxboro Associates could end up as the landlord of FP after FR1 dropped out. But FRA, as noted above, is not sought to be held to a long term lease as successor to Foxboro Associates; merely as an alleged successor to FR1. In any event, the Prime Lease never was entered. It is true that, at the time Foxboro Associates and Route 1 entered into the 1990 Option Agreement (Exhibit 4), they anticipated that Route 1 would not actually reopen and operate the Raceway. Rather, they anticipated that Route 1 would enter into a sublease with an entity owned or controlled by Charles Sarkis. But for Mr. Sarkis’ entity to get a long term sublessee, he initially had to go through FR1 as, if and when FR1 became Prime Lessee, at least through the option period.
FP points out that in 1992, Foxboro Park reopened the Raceway. Although the Raceway briefly operated as a thoroughbred track, the Raceway has operated as a harness racing facility since 1992. Simulcast wagering is also permitted at the Raceway. Foxboro Associates, through Mr. Andelman, has known since 1992 that the Raceway was being operated as a harness track. Foxboro Associates never objected to this fact. These facts are not asserted by plaintiffs as some kind of breach. They indicate that everyone was aware that the raceway was being operated.
As noted above the relationship between the stated purchase price and the prior deal is not persuasive evidence of some legal identity between FRA and FR1. Even if the $16.2 million purchase price set forth in Exhibit 14 and to be paid by FRA was arrived at by subtracting the $2,556,688 credit earned by Route 1 from the $18,700,000 purchase price set forth in the October 18, 1995 Purchase and Sale (Exhibit 11) and adding back the $56,688 owed by Foxboro Associates to Route 1 under the Promissory Note this dos not lead *350 the court to conclude that FRA was receiving a credit from FR1. It is more likely that it used this prior windfall to Foxboro Associates as a bargaining chip, not a claimed credit.
In response to certain requested rulings of law filed by FP, the court notes that FR1 was in a position to grant a 35 year sublease only if it entered into the prime lease, which it did not; that Foxboro Associates was aware generally of the terms of the escrowed sublease and the fact that FP was operating the raceway but there is no sufficient evidence to persuade the court as FP requests it to rule that Foxboro Associates consented to all of the terms or waivers of terms which FP now asserts. Furthermore, the mere fact that Mr. Robert Kraft or his family was the beneficial owner of FRA and a fifty percent beneficial owner of FR1 along with his knowledge or notice of the facts relating to the purchase and sale between FR1 and Foxboro Associates and the other business of FR1 in its dealings with FP did not put FRA in the shoes of FR1 with regard to the rights if any of FP.
Points Raised in Defendants’ Trial Brief
The defendants cited the arguments in their trial brief as additional requests for rulings of law. The court notes in regard thereto, the following points:
Miller v. Berk, 328 Mass. 393, 397 (1952), cited by the defendants, held that a person holding himself out as a landlord may not avoid liability in tort for injuries arising out of the negligent maintenance of the property by holding the property in the name of a straw. The possible duty to maintain the premises in that case arose from the landlord’s contract with the tenant, not merely from his supposed status as owner of the property. This was also a case in which the landlord concealed his true status. To the same effect see Backoff v. Veiner, 305 Mass. 375, 377 (1940) and Skolnick v. East Boston Savs. Bank, 307 Mass. 1, 3 (1940).
In Connors v. Wick, 317 Mass. 628, 630 (1945), the tenant tried to avoid eviction by citing the landlord’s lack of title. But he was estopped to dispute the landlord’s title because he entered and remained as tenant and assumed the benefits of the tenancy and it would be unjust to allow to assert the defect in the landlord’s title.
In this case the parties clearly required that FR1 have a prime lease before the sublease could arise. Thus, Lindsey v. Leighton, 150 Mass. 285, 287-88 (1889), quoted by the defendants, is not in point, nor is Crowe v. Bixby, 237 Mass. 249, 251 (1921) (following Lindsey).
If FR1 had a prime lease with Foxboro Associates then the defendants’ citation of Albiani v. Evening Traveler Co., 220 Mass. 20 (1914), would be appropriate authority for the proposition that a sublease can extend for longer than a prime lease, in the circumstances of this case. But the prime lease never came into existence.
Connery v. Cass, 277 Mass. 545, 549 (1931), contrary to the purpose for which it was cited by the defendants, was a case in which the tenant did not know the true facts relating to title and could have reasonably believed, based upon the conduct of a party, although not his words, that the party was the landlord. Lack of knowledge of the true state of the title was relevant.
None of these cases stand for the proposition that, if FR1 (or a supposed successor such as FRA) merely comes into position to perform under the sublease, the sublease is capable of specific performance.
In Carey’s, Inc. v. Carey, 25 Mass.App.Ct. 290, 298 (1988), relied upon by the defendants, all the relevant parties were in the dark about the true state of the title. Furthermore, applying the general principle of estoppel, the circumstances would have made it unjust for the defendant lessor to rely on the true state of the title.
This doctrine of estoppel by lease is well illustrated by the case of Susse Chalet Inn of Holyoke, Inc. v. Howard D. Johnson Co., 12 Mass.App.Ct. 31 (1981). In that case, on August 9, 1960 a purported sublessor known as “333" executed a sublease with Howard Johnson. 333, however, had no interest in the property. Three days later, on August 12, 1960, the owner of the Property executed a lease with 333’s president, Lucier. Howard Johnson took occupancy, improved the premises, and performed under the lease through 1978. At that point, Susse Chalet acquired a lease of the property, ordered Howard Johnson to vacate, and a trial judge agreed that Howard Johnson had no rights. See id. at 32-33. The Appeals Court reversed. Susse Chalet had taken its lease subject to the 1960 sublease. See id. at 33. The 1960 sublease was found valid by the Appeals Court. The Appeals Court found that the conduct of persons possessing an interest in the property supported an inference that a lease from Lucier to 333 "existed at some time." Id. at 35. “If it did exist, Lucier, once he obtained from [the owner] the ... lease on August 12, 1960, acquired a leasehold interest which in good conscience immediately should be treated as validating Lucier’s 1960 sublease to 333 and 333’s 1960 sublease to Howard Johnson, under a doctrine analogous to, or in effect a part of, that of estoppel by deed.” Id. This doctrine is that of estoppel by lease. See id. at 35-36.
General Findings
1) The assumptions under which the court has tried these issues are described in detail above. In summary, they are:
A. FP claims a right to occupy based solely on the 6/17/91 “escrow lease” document; see order of April 7, 1997.
*351 B. The conditions of escrow agreement were waived or satisfied;
C. The escrow lease document was sufficiently definite.
2) The court finds that there was no Prime lease at any time between Foxboro Associates and FR1.
3) Whatever other rights were created by the assumed fact that the conditions of the escrow agreement were waived or satisfied, there was no conveyance of a leasehold interest and no lease as such between FR1 and FP at any time prior to the conveyance of the property to FRA by Foxboro Associates in May of 1996.
4) Even if it is assumed that FRA and FR1 are identical, FP is not entitled to the benefit of any doctrine of estoppel. FR1 at no time claimed that it had a prime lease. FP was aware at all times that FR1 did not have a prime lease. There are no circumstances in this case which make it unjust for FR1 to state a true fact: that it had no prime lease from Foxboro Associates. Thus, in stating a true fact, it has a complete defense to the claim of FP that it conveyed a leasehold estate to FP.
5) Thus whatever rights FP would like to claim to entitle it to remain on the property are not rights under a lease. By the order of April 7, 1997 it is not entitled to remain on the property on any other legal theory.
Order
Based upon the foregoing findings and rulings, Foxboro Park, Inc. is not entitled to possession of the premises. Counsel shall submit further forms of orders to effectuate the court’s decision.

 Plaintiff has accurately stated the issues in the terms the court initially advised the parties: “(1) whether on June 17, 1991, when Foxboro Route 1 Limited Partnership (’FRl’j entered into the 1991 Escrow Letter Agreement with attached form of sublease (Ex. 7), FR1 had a sufficient interest in the Property at issue (as opposed to a mere contractual right to potentially obtain such an interest) to grant Foxboro Park, Inc. (’Foxboro Park’) a 35-year leasehold interest in the Property; (2) if not, whether subsequent events created such an interest and also caused the escrowed form of sublease appended to the Escrow Letter Agreement somehow to spring into effect so as to bind FR1; and (3) even if the answer to either of the foregoing questions is ‘yes,’ whether Foxboro Realty Associates LLC became bound to the terms of the escrowed form of sublease (as it is claimed to be modified) when it purchased the Property on May 28, 1996, over four months after whatever rights FR1 had with respect to the Property, including whatever contractual rights it had to potentially obtain rights in the Property, had expired." Plaintiffs' Proposed Findings of Fact and Conclusion of Law at pp. 1-2. The court’s restatement of the issues is a refinement of that statement in view of the evidence and arguments of counsel.

 The following facts relating to the events in 1990 and subsequently are not intended to address the issues raised in the defendants’ counterclaims, nor the issues reserved for further trial, if necessary, on the balance of the claims and defenses relating to the rights of FP to possession.

 By letter dated November 28, 1990, counsel for FR1, Michael J. Haroz, notified counsel for Foxboro Associates, Walter D. Wekstein, of a “mistake" in the October 19, 1990 letter agreement. See Trial Exhibit 5. The “execution copy” of the document omitted certain changes on which the parties had agreed. Rather than re-execute the document, FRl’s counsel delivered to Foxboro Associates’ counsel substitute pages to the October 19, 1990 document containing the agreed upon pre-execution changes, which were initialed and approved by counsel for Foxboro Associates. The Court, therefore, treats the October 19, 1990 letter agreement, as corrected by the aforementioned substitute pages, as the operative document (hereinafter the “1990 Option Agreement”).

 The court does not make findings on facts not relevant to the narrow issues being tried in this phase of the case.

 The agreement is also referred to as “supplemented by the letter dated November 1, 1990" to which the parties have not referred.

 This provision is not of the type of condition which FP reserved the right to prove was waived or abandoned. The reference in the Order of April 7, 1997 was to the defined term “conditions” set forth in paragraph 3 of the June 17, 1991 Escrow Letter Agreement. Insofar as FP relies on a “contract” theory as opposed to a “property law” or “estoppel” theory, this provision of the June 17, 1991 Escrow Letter Agreement is part of the evidence which must be examined to evaluate the contract theory.

 THE PURCHASE PRICE IN THE OCTOBER 18, 1995 PURCHASE AND SALE AGREEMENT (EXHIBIT 11) WAS $18,700,000. IN ADDITION, ROUTE 1 WAS TO RECEIVE A CREDIT OF $2,556,688, REPRESENTING MONIES PREVIOUSLY ADVANCED TO FOXBORO ASSOCIATES. THUS, THE TOTAL AMOUNT DUE TO FOXBORO ASSOCIATES AT CLOSING WAS $16,143,312. Foxboro Associates still owes Route 1 $56,688 under a Promissory Note dated October 1990 (Exhibit 16).